[No. B167180. Second Dist., Div. Four. May 28, 2004.]

ASSA WEINBERG, Plaintiff and Appellant, v.
CEDARS-SINAI MEDICAL CENTER, Defendant and Respondent.

1100

COUNSEL

Silver & Field, Lawrence Silver and Mark E. Field for Plaintiff and Appellant.

Catherine I. Hanson and Gregory M. Abrams for California Medical Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Bingham McCutchen, Susan L. Hoffman, Elizabeth Van Horn, Hwannie Lee; Greines, Martin, Stein & Richland, Robin Meadow and Michael D. Fitts for Defendant and Respondent.

Horvitz & Levy, David M. Axelrad and Robert H. Wright for California Healthcare Association as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**CURRY, J.**—Appellant Assa Weinberg, M.D., sought administrative mandamus against respondent Cedars-Sinai Medical Center. The trial court denied Weinberg's petition. We affirm.

### RELEVANT FACTUAL AND PROCEDURAL HISTORY

Respondent is a nonprofit public benefit corporation and accredited acute care hospital. Weinberg, a licensed physician, was appointed to respondent's medical staff in 1988. The case before us arises out of disciplinary proceedings against Weinberg that culminated in the termination of his staff privileges and membership.

Under the constitution, rules, and regulations of respondent's medical staff, disciplinary proceedings are initiated by the chief medical officer (CMO). The physician in question is entitled to notice of charges, access to evidence regarding the charges, and a hearing before a committee of physicians at which the physician may present evidence, and cross-examine witnesses. The hearing committee's recommendation is submitted to the medical executive committee (MEC), which reviews the record to ensure that (1) the physician received a fair hearing, and that (2) the recommendation is supported by the evidence and is consistent with the medical staff's constitution, bylaws, and practices.

The physician in question may request an appeal from the MEC's recommendation to respondent's board of directors (Board). Absent any such request, the Board "will either: (i) render a final decision in writing; or (ii) remand the matter back to the [MEC] and/or Hearing Committee for further action or deliberation . . . , and render a final decision at the next regularly scheduled Board meeting."

In November 1999, respondent's CMO notified Weinberg that his staff privileges were suspended due to substandard performance, and that he was entitled to a hearing on the matter. Weinberg requested a hearing, and in December 1999, respondent sent Weinberg an amended notice of charges.

The hearing occurred between July 2000 and December 2001 before a six-member committee. Weinberg was represented by counsel, and the hearing committee received testimony and other evidence concerning Weinberg's treatment of nine patients.

The hearing committee's report to the MEC was not unanimous. Four of the six committee members identified deficiencies in Weinberg's performance, but they declined to recommend termination of his staff privileges and membership.

The majority found that in one case, Weinberg had misprescribed the dosage of a drug for a patient, and this inappropriate dose was a contributing factor in the patient's death. With respect to the remaining eight patients, the majority found, inter alia, that he had delayed seeking a consultation with a cardiologist; failed to record conversations with a pharmacist about an adjustment to the dosage of a drug; engaged in substandard record keeping; recommended use of a drug with which other physicians disagreed; upset a patient's wife by telling her that she would be killing her husband by having a medical tube removed, despite her express desire that her husband receive only hospice service; failed to record in a timely manner a patient's desires about terminating chemotherapy; and failed to address in a timely manner a family's desire to end treatment, notwithstanding the family's durable power of attorney. Nonetheless, the majority concluded that Weinberg's conduct in each of these cases did not warrant suspension of his staff privileges, and it recommended that he should have the opportunity to resolve his deficiencies.

Two of the committee members dissented. With respect to the first of the aforementioned patients, the minority found that Weinberg's error in misprescribing the dosage "contributed significantly to the death of the patient." Furthermore, the minority found that his prescription practices regarding a second patient were "at odds with hospital protocol." In view of "the totality of many cases," the minority concluded that Weinberg "represent[ed] a continuing imminent danger to his patients." In addition, it concluded that Weinberg was "difficult or impossible to work with," and that his errors and personality traits warranted permanent suspension.

On May 20, 2002, the MEC recommended to the Board that Weinberg's privileges should not be terminated. A special subcommittee of the Board with access to the record of the hearing committee then reviewed the MEC's report and recommendations. In view of the division of opinion within the hearing committee, the special subcommittee advised the Board to ask the MEC to reconsider the matter and address six enumerated issues "based on the cumulative results of the nine case findings" in the hearing committee report.

The Board directed the MEC to reconsider its recommendation. On September 9, 2002, the MEC reaffirmed this recommendation and resolved the enumerated issues. Regarding the recommendation, the vote tally was as follows: Yes—22; No—5; Abstain—0.

Regarding the enumerated issues, the voting results were as follows: (i) Did Weinberg meet respondent's standard of professional conduct? Yes—17; No—10; Abstain—0. (ii) Did Weinberg not pose a risk to patients in his care? Yes—18; No—7; Abstain—2. (iii) Was Weinberg capable of following hospital protocols with respect to the prescription of medication? Yes—21; No—5; Abstain—1. (iv) Was Weinberg capable of modifying his behaviors and attitudes so as not to represent a threat to patients, patients' family members, employees, or others in the hospital setting? Yes—15; No—3; Abstain—9. (v) Did Weinberg meet medical staff rules and regulations concerning appropriate medical record documentation? Yes—11; No—15; Abstain—1. (vi) Did Weinberg meet respondent's policy and procedures regarding compliance with the documented end-of-life desires of his patients and their legal representatives? Yes—14; No—8; Abstain—5.

On October 4, 2002, the Board issued its final decision to Weinberg and terminated his staff privileges and membership. The final decision observed the lack of unanimity within the hearing committee and the MEC, and stated: "[W]ithout substituting the lay Board member's [*sic*] medical judgment for that of the members of the Hearing Committee or MEC and even giving great weight to the findings of the Hearing Committee majority, the conclusions and recommendations drawn by the Hearing Committee majority and endorsed by the MEC are not supported by the substantial evidence contained in the record."

The final decision contains the following determinations: "E. That the appropriate standard of review of the nine (9) cases focused upon by the

Hearing Committee[] should have been the cumulative or aggregate weight of the evidence. That was not the standard used by the Hearing Committee majority. [¶] F. That your medical care poses a potential and imminent risk to patients in your care. [¶] G. That the record contains significant and recurring evidence of medication errors contributing to the death of at least one patient and reflecting a plan to experiment on another. [¶] H. That you violated the rights of patients and their families in end-of-life cases. [¶] I. That your medical record documentation does not meet the [pertinent] standards . . . , and that your lapses in documentation placed patients in jeopardy. [¶] J. That the record reflects your continuing refusal to change your deficient medical record practices despite notice and an opportunity to self-correct."

On December 18, 2002, Weinberg filed a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5. On May 2, 2002, the trial court denied the writ, and judgment was entered in accordance with this ruling. This appeal followed.

## DISCUSSION

Weinberg contends that the trial court improperly denied its petition for writ of administrative mandamus because the Board (1) applied an incorrect standard in making its decision, (2) has a conflict of interest, (3) lacked statutory authorization for its decision, and (4) received improper ex parte communications. As we explain below, he is mistaken.

### A. *Standard of Review*

Code of Civil Procedure section 1094.5, which provides for administrative mandamus, authorizes the trial court to determine "the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer . . . ." (§ 1094.5, subd. (a).)

Generally, in examining a hospital board's decision, the superior court must determine two issues. (*Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1136 [73 Cal.Rptr.2d 695]; Code Civ. Proc., § 1094.5, subds. (b)–(d).) "First, it must determine whether the governing body applied the correct standard in conducting its review of the matter.

Second, after determining as a preliminary matter that the correct standard was used, then the superior court must determine whether there was substantial evidence to support the governing body's decision." (*Hongsathavij v. Queen of Angels etc. Medical Center, supra,* 62 Cal.App.4th at p. 1136.)

Here, Weinberg has not included that evidence presented to the hearing committee within the record on appeal. Generally, "[i]n a section 1094.5 proceeding, it is the responsibility of the petitioner to produce a sufficient record of the administrative proceedings; '. . . otherwise the presumption of regularity will prevail . . . . [Citations.]' " (*Elizabeth D. v. Zolin* (1993) 21 Cal.App.4th 347, 354 [25 Cal.Rptr.2d 852].) For this reason, we presume that substantial evidence supports the Board's decision, and thus our inquiry is limited to whether the Board applied correct standards in making its decision. This is a question of law that we review de novo. (See *Hongsathavij v. Queen of Angels etc. Medical Center, supra,* 62 Cal.App.4th at p. 1136; *Huang v. Board of Directors* (1990) 220 Cal.App.3d 1286, 1294–1295 [270 Cal.Rptr. 41].)

## B. *Business and Professions Code Section 809.05, Subdivision (a)*

Weinberg's contentions hinge on the standard for the Board's decision delineated in Business and Professions Code section 809.05.[1] We therefore begin with an examination of this provision, which states in pertinent part: "It is the policy of this state that peer review be performed by licentiates. This policy is subject to the following limitations: [¶] (a) The governing bodies of acute care hospitals have a legitimate function in the peer review process. In all peer review matters, the governing body shall give great weight to the actions of peer review bodies and, in no event, shall act in an arbitrary or capricious manner."

The key issues here concern the application of this provision to the Board's final decision. Because no court has interpreted this provision, these issues involve questions of statutory interpretation. (*County of Tulare v. Campbell* (1996) 50 Cal.App.4th 847, 853 [57 Cal.Rptr.2d 902].) "The objective of statutory interpretation is to ascertain and effectuate legislative intent. To accomplish that objective, courts must look first to the words of the statute, giving effect to their plain meaning. If those words are clear, we may not alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437 [35 Cal.Rptr.2d 155].)

---

[1] All further statutory citations are to the Business and Professions Code, unless otherwise indicated.

Section 809.05 belongs to a statutory scheme (§ 809 et seq.) enacted in 1989 that "essentially codifie[s] the requirements previously recognized in case law governing a physician's right to a hearing regarding the termination of his or her staff privileges." (*Sahlolbei v. Providence Healthcare, Inc.* (2003) 112 Cal.App.4th 1137, 1147 [5 Cal.Rptr.3d 598].) As the court explained in *Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 622 [113 Cal.Rptr.2d 309], "although [this statutory scheme] delegates to the private sector the responsibility to provide fairly conducted peer review in accordance with due process, including notice, discovery and hearing rights, it also defines what constitutes minimum due process requirements for the review process."

■ In our view, section 809.05 places a boundary on a governing body's role in the peer review process, but it does not specify this role. Section 809.05, on its face, ensures the Board a "legitimate function" in the peer review process without mandating the form this function must take. Generally, case authority establishes that the governing body's precise role within the peer review process of a given hospital is determined by the bylaws and regulations of the medical staff. (*Hongsathavij v. Queen of Angels etc. Medical Center, supra,* 62 Cal.App.4th at p. 1136; *Huang v. Board of Directors, supra,* 220 Cal.App.3d at pp. 1294–1295.) Here, the medical staff's constitution, rules, and regulations make the Board the final decision maker in the peer review process, but they do not limit its role to that of an appellate body reviewing the MEC's recommendation for the existence of substantial evidence, or otherwise identify the standard governing the Board's decisions. We therefore conclude that the Board's decisionmaking is subject only to the standard found in section 809.05, subdivision (a).

■ The remaining question concerns the nature of the standard that this provision imposes on governing bodies. To the extent that the provision bars arbitrary or capricious action by a hospital's governing body, it invokes the standard applicable to quasi-legislative administrative rulemaking under traditional mandamus. (Code Civ. Proc., § 1085.) In this context, the trial court's review is limited to whether the agency exceeded its proper authority, used unfair procedures, or acted in a manner that was " ' "arbitrary, capricious, or entirely lacking in evidentiary support." ' " (*Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 383 [146 Cal.Rptr. 892], quoting *Pitts v. Perluss* (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83].) As Witkin has explained, this deferential standard respects that agency's presumed expertise within its delegated authority. (9 Witkin, Cal. Procedure (4th ed. 1997) Administrative Proceedings, § 116, p. 1160.)

■ However, to the extent that subdivision (a) of section 809.05 requires a hospital's governing body to "give great weight to the actions of peer review bodies," it evokes a limitation on the trial court's exercise of its independent judgment (when appropriate) in administrative mandamus. Generally, when administrative action implicates a public employee's fundamental vested rights, the superior court "exercises its independent judgment upon the evidence disclosed in a limited trial de novo." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242, fn. omitted].)

■ Nonetheless, in exercising this judgment, the trial court "must afford a strong presumption of correctness concerning the administrative findings." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 [85 Cal.Rptr.2d 696, 977 P.2d 693].) This standard is alternatively expressed as the requirement that the agency's findings should be given "substantial weight" or "great weight." (See *id.* at pp. 817–819.) As our Supreme Court indicated in *Fukuda v. City of Los Angeles, supra,* 20 Cal.4th at page 821, the rationale for this standard relies, in part, on the "observation that such findings often are the product of expertise."

■ In view of the language of section 809.05, subdivision (a), we conclude that the Legislature has fashioned a standard of decision for hospital governing bodies that tracks the aforementioned principles. Under this standard, (1) the Board's action is subject to deferential review, provided that it acted within its delegated authority, and (2) it properly exercised independent judgment upon the relevant evidence, provided that it accorded due weight to the findings of the hearing committee and MEC, insofar as these findings reflect their domain of expertise.

■ Regarding item (1), we further conclude that the Board's authority encompasses final responsibility for the quality of its medical staff and care, and thus its decisions within this domain are entitled to deference. Respondent owes a duty of a fiduciary nature to its patients and the public to deliver safe and competent medical services. (*O'Byrne v. Santa Monica-UCLA Medical Center* (2001) 94 Cal.App.4th 797, 811 [114 Cal.Rptr.2d 575; *Hongsathavij v. Queen of Angels etc. Medical Center, supra,* 62 Cal.App.4th at p. 1143; *Elam v. College Park Hospital* (1982) 132 Cal.App.3d 332, 346–347 [183 Cal.Rptr. 156].) This duty is recognized in subdivision (d) of section 809.05, which provides that in the peer review process, "[a] governing body and the medical staff shall act exclusively in the interest of maintaining and enhancing quality patient care."

■ Ultimate responsibility for the discharging of this duty falls upon the Board, which is entitled to act in accordance with principles of sound corporate governance. (*Hongsathavij v. Queen of Angels etc. Medical Center,*

*supra*, 62 Cal.App.4th at pp. 1142–1143.) Furthermore, as we have explained, the constitution, bylaws, and regulations of respondent's medical staff render the Board the final arbiter in peer review proceedings.

Citing *Hongsathavij v. Queen of Angels etc. Medical Center, supra*, 62 Cal.App.4th 1123, and *Huang v. Board of Directors, supra*, 220 Cal.App.3d 1286, Weinberg disagrees with item (2), contending that the Board was required to review the actions of the hearing committee and the MEC for the existence of substantial evidence. However, neither section 809.05 nor these cases support this contention. As we have explained, section 809.05, by its plain language, does not impose substantial evidence review upon the Board. Moreover, unlike the case before us, the medical staff bylaws at issue in *Hongsathavij* and *Huang* expressly required the pertinent governing bodies to apply substantial evidence review. (*Hongsathavij v. Queen of Angels etc. Medical Center, supra*, 62 Cal.App.4th at p. 1135; *Huang v. Board of Directors, supra*, 220 Cal.App.3d at p. 1293.)

## C. *"Great Weight"*

Weinberg's first contention is that the Board did not accord great weight to the actions of the hearing committee and the MEC. He is mistaken.

As the *Fukuda* court explained, the pertinent presumption of correctness "provides the trial court with a starting point for review—but it is only a presumption, and may be overcome. Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings." (*Fukuda v. City of Angels, supra*, 20 Cal.4th at p. 818.) That the trial court gave due weight to the findings is demonstrated by its conduct in assessing these findings. (See *Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 205 [99 Cal.Rptr.2d 357].)

██ Although these principles apply to the trial court's exercise of its independent judgment in administrative mandamus, they guide our inquiry here. The Board's final decision, on its face, indicates that the Board accepted the hearing committee's findings, insofar as these involved medical expertise, but it rejected the inferences that the hearing committee majority (and subsequently the MEC) drew from these findings in tendering recommendations. According to the Board, the majority had not assessed the "cumulative or aggregate weight of the evidence," and thus it had failed to recognize the entrenched hazards posed by Weinberg to his patients and colleagues, given the overall pattern of his conduct. In our view, the latter determination falls within the Board's delegated authority to protect patients, and thus it is entitled to deference. We therefore conclude that the Board properly accorded

"great weight" to the actions of the hearing committee and MEC under section 809.05, subdivision (a).[2]

Weinberg disagrees for several reasons, none of which have merit. First, he contends that the Board did not engage in an independent review of the evidence, notwithstanding the Board's statement in the final decision that it had done so. However, we presume that Board acted properly with respect to this evidence, absent an affirmative showing to the contrary. (*Cooper v. State Board of Public Health* (1951) 102 Cal.App.2d 926, 931 [229 P.2d 27].)

Second, Weinberg contends that the hearing committee's report does not support the Board's determination that the hearing committee majority had ignored "the cumulative or aggregate weight of the evidence." We disagree. Support for this determination is found in the minority's findings and conclusions, which were incorporated in the hearing committee's report. On this matter, the minority stated: "It is the totality of many cases that leads us to conclude that Dr. Weinberg represents a continuing imminent danger to his patients."

Third, Weinberg contends that (1) the opinion of the hearing committee minority does not fully support the Board's determinations, and (2) Board improperly ignored the MEC's conclusions and recommendations following the remand to the MEC. However, as we have indicated, the minority's conclusions are consistent with the Board's determinations, and in any event, the Board was properly entitled to exercise its own judgment about the evidence, after giving due weight to the hearing committee's findings.

Finally, Weinberg suggests that the Board's final decision does not properly articulate the connection between the evidence and the Board's conclusions.

---

[2] We recognize that the Board's final decision states that "the conclusions and recommendations" of the hearing committee and MEC "are not supported by the substantial evidence contained in the record," suggesting that the Board assumed the role of an appellate body and reviewed the actions of the hearing committee and MEC for the existence of substantial evidence. Nonetheless, we conclude that the Board exercised its independent judgment regarding these determinations, given the remarks in the final decision concerning the need to assess "the cumulative or aggregate weight of the evidence."

However, even if the Board had limited the scope of its decisionmaking to review for the existence of substantial evidence, we would not discern error. Review of this sort is highly deferential, and thus it complies with the statutory mandate that the Board must give "great weight" to the actions of the hearing committee and the MEC. (Cf. *Hongsathavij v. Queen of Angels etc. Medical Center, supra*, 62 Cal.App.4th at pp. 1134–1141 [hospital board, acting as appellate body and engaged in review for the existence of substantial evidence, properly reversed recommendations of peer review committee].) Because Weinberg's record on appeal does not contain the evidence before the Board, we cannot assess whether this evidence unequivocally supports the Board's determinations, as stated in the Board's final decision. Accordingly, Weinberg has failed to establish error in this matter.

Again, we disagree. Code of Civil Procedure section 1094.5 requires administrative agencies rendering adjudicatory decisions subject to administrative mandamus to "set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) Such findings are sufficient when "they apprise the interested parties and the courts of the basis for administrative action." (*Gaenslen v. Board of Directors* (1985) 185 Cal.App.3d 563, 573 [232 Cal.Rptr. 239].) That is the case here.

### D. *Conflict of Interest*

Weinberg contends that the Board is subject to a conflict of interest that operated to deny him due process. He argues that an improperly suspended physician may not initiate litigation against respondent until the suspension is set aside, either through respondent's peer review process or in court, and thus the Board has an incentive to immunize respondent by suspending or revoking the physician's staff privileges and membership.

This contention was rejected in *Hongsathavij v. Queen of Angels etc. Medical Center, supra,* 62 Cal.App.4th at pages 1142–1143. In *Hongsathavij,* the pertinent bylaws of the medical staff provided that the hospital board, sitting as an appellate body, was to review the recommendations of the peer review committee and render a final decision about the termination of physician privileges. (*Id.* at p. 1135.) After the board reversed a recommendation that a suspended physician should be reinstated, the physician contended before the court in *Hongsathavij* that he had been denied due process because the board had a financial incentive to prevent his reinstatement.

██ The *Hongsathavij* court concluded that the physician's contention was mistaken. (*Hongsathavij v. Queen of Angels etc. Medical Center, supra,* 62 Cal.App.4th at pp. 1142–1143.) It observed that in the administrative setting, the overlapping of investigatory, prosecutorial, and adjudicatory functions is common, and it does not necessarily deny a fair hearing. (*Id.* at p. 1142.) Furthermore, it determined that the "rule of necessity" precluded a claim of structural bias. (*Id.* at pp. 1142–1143.) Under this principle, "where an administrative body has a duty to act, and is the only entity capable of acting, the fact that the body may have an interest in the result does not disqualify it from acting." (*Ibid.*) Because ultimate responsibility for ensuring the competence of the medical staff fell on the board, and not the medical staff, the court in *Hongsathavij* reasoned that the board "must be permitted to align its authority with its responsibility and to render the final decision." (*Id.* at p. 1143.)

We find this reasoning compelling, and thus we follow *Hongsathavij* on this matter. Weinberg nonetheless urges us to depart from *Hongsathavij*, arguing that the rule of necessity ordinarily applies only to public bodies. We are not persuaded. As we have explained (see pt. B., *ante*), the statutory scheme governing the peer review process in hospitals "delegates to *the private sector* the responsibility to provide fairly conducted peer review." (*Unnamed Physician v. Board of Trustees, supra,* 93 Cal.App.4th at p. 622, italics added.) In view of this statutory delegation, the rule of necessity is properly applied to the Board, notwithstanding its status as a private body.

Weinberg also contends that the necessity here is illusory because the Board, and not the medical staff, instituted the pertinent constitution, bylaws, and rules. However, "[a] hospital's medical staff is a separate legal entity, an unincorporated association, which is required to be self-governing and independently responsible from the hospital for its own duties and for policing its member physicians." (*Hongsathavij v. Queen of Angels etc. Medical Center, supra,* 62 Cal.App.4th at p. 1130, fn. 2.) California's regulations regarding health facilities require medical staffs to adopt their bylaws and other rules by a vote "and with the approval of the governing body." (Cal. Code Regs., tit. 22, § 70703, subd. (b).) Nothing in the record suggests that the medical staff here failed to follow this procedure.

Finally, citing *Mennig v. City Council* (1978) 86 Cal.App.3d 341 [150 Cal.Rptr. 207], Weinberg contends that the rule of necessity is inapplicable to the Board's decision in the circumstances of this case. However, *Mennig* is distinguishable.

In *Mennig*, a city's civil service rules provided that the civil service commission's determinations about the police chief were binding, unless they were overturned by a unanimous vote of the city council. (*Mennig v. City Council, supra,* 86 Cal.App.3d at pp. 345–346.) The police chief fell into a dispute with members of the city council, and it dismissed him. (*Id.* at pp. 345–348.) When the civil service commission determined that the police chief should be reinstated, the city council voted unanimously to discharge him. (*Id.* at pp. 345–348.)

The trial court in *Mennig* concluded that the city council was not an independent decision maker regarding the police chief, given the personal animosity of its members toward him. (*Mennig v. City Council, supra,* 86 Cal.App.3d at p. 349.) On appeal, the court held that the rule of necessity did not support the city council's action, reasoning that the city council was not the sole decision maker capable of acting on the matter, given that the civil service commission's actions were binding absent action by the city council. (*Id.* at pp. 351–352.)

Unlike *Mennig*, the medical staff's constitution, rules, and regulations expressly entitle the Board to make final decisions about peer review matters, rendering it the sole decision maker capable of acting on these matters. In addition, unlike *Mennig*, Weinberg's suspension involved concerns about patient safety, for which the Board had ultimate responsibility. Accordingly, *Mennig* does not disturb our application of the rule of necessity in the case before us.

### E. *Lack of Statutory Authority*

Weinberg contends that section 809.05, taken as a whole, denied the Board any authority to act with respect to his suspension. He argues that section 809.05 authorized the Board to act regarding him *only* if no peer review body such as the MEC first initiated action, and that otherwise it placed the peer review process *entirely* in the hands of the medical staff members.

In support of this contention, Weinberg cites the initial sentence of section 809.05, which states: "It is the policy of this state that peer review be performed by licentiates." He also points to the following provisions of section 809.05: "(b) In those instances in which the peer review body's failure to investigate, or initiate disciplinary action, is contrary to the weight of the evidence, the governing body shall have the authority to direct the peer review body to initiate an investigation or a disciplinary action, but only after consultation with the peer review body. . . . [¶] (c) In the event the peer review body fails to take action in response to a direction from the governing body, the governing body shall have the authority to take action against a licentiate. . . ."

We reject Weinberg's contention. Generally, "we must give effect to every word in a statute and avoid a construction making a statutory term surplusage or meaningless. [Citations.]" (*In re Jerry R., supra*, 29 Cal.App.4th at p. 1437.) Here, the second sentence of section 809.05 provides that subdivision (a)—which describes the role of governing bodies in the peer review process—is a *"limitation"* on the policy announced in the first sentence. (Italics added.) Furthermore, subdivision (a) states that its standard for decisionmaking by governing bodies is applicable "[i]n *all* peer review matters." (Italics added.) In view of this express language, we conclude that the Legislature authorized governing bodies to act in *all* peer review proceedings, and that subdivisions (b) and (c) of section 809.05 apply only in an exceptional situation, namely, when peer review bodies fail to initiate proceedings.[3]

---

[3] Weinberg also contends that the Board failed to give him a hearing before it issued its final decision, in contravention of section 809.1, subdivision (b). However, this provision states only that a *peer review body*—not the governing body—must give the physician in question the

## F. Ex Parte Communication

Finally, Weinberg contends that the Board had improper ex parte contact with the medical staff's chief of staff before rendering its decision. As we explain below, this contention fails on the record before us.

In administrative proceedings, "a party claiming that the decision maker was biased must show actual bias, rather than the appearance of bias, to establish a fair hearing violation. [Citation.]" (*Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 549 [133 Cal.Rptr.2d 527].) "[B]ias in an administrative hearing context can never be implied, and the mere suggestion or appearance of bias is not sufficient." (*Hongsathavij v. Queen of Angels etc. Medical Center, supra*, 62 Cal.App.4th at p. 1142.)

 Under California's regulations regarding health facilities, the medical staff is required to institute a procedure by which the activities of its committees are reported to the Board on a regular basis. (Cal. Code Regs., tit. 22, § 70703, subd. (d).) Here, the medical staff's constitution designates the chief of staff to be (1) a nonvoting member of all medical staff committees, including the MEC, and (2) the chair of the MEC. The chief of staff reports regularly to the Board and participates in its meetings. The position of chief of staff is thus different from that of the CMO, who is authorized to initiate disciplinary proceedings. In the underlying proceedings, these positions were occupied by different individuals.

The Board's final decision indicates that the chief of staff appeared at the Board's last meeting on Weinberg, and was asked to make a report and respond to the MEC's recommendation following the remand to the MEC. The final decision further states the Board's determinations were "[b]ased on the entire record before it, the reports and the ensuing discussion."

Nothing in the record discloses the substance of the chief of staff's report to the Board, or indicates that Weinberg tried to obtain the contents of this report from the Board. Because Weinberg failed to raise this issue before the Board, it is waived. (*Southern Cal. Underground Contractors, Inc. v. City of San Diego, supra*, 108 Cal.App.4th at p. 549.) However, even if it were not waived, he has failed to demonstrate actual bias, given that the chief of staff's report at the Board's hearing—taken by itself—was authorized by the medical staff's constitution.

---

opportunity for a hearing on its "final proposed action," which is defined as "the final decision or recommendation of the peer review body." (§ 809.1, subd. (a).) Weinberg was accorded this hearing.

## DISPOSITION

The judgment is affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 29, 2004. George, C. J., did not participate therein.