[No. A124408. First Dist., Div. Five. Apr. 22, 2010.]

BRUCE E. ELLISON, Plaintiff and Appellant, v.
SEQUOIA HEALTH SERVICES, Defendant and Respondent.

COUNSEL

Moscone, Emblidge & Quadra, G. Scott Emblidge and Rachel J. Sater for Plaintiff and Appellant.

Law Office of Jeffrey C. Grass and Jeffrey C. Grass for Semmelweis Society International, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

Manatt, Phelps & Phillips, Barry S. Landsberg, Doreen W. Shenfeld and Joanna S. McCallum for Defendant and Respondent.

OPINION

**NEEDHAM, J.**—Defendant and respondent Sequoia Health Services (Sequoia) terminated the medical staff membership and hospital privileges of plaintiff and appellant Bruce E. Ellison, M.D., a licensed physician specializing in orthopedic medicine. Dr. Ellison appeals from a judgment denying his petition for writ of mandate to compel the reinstatement of his privileges. (Code Civ. Proc., § 1094.5.) We affirm.

## FACTS AND PROCEDURAL HISTORY

Dr. Ellison graduated from Stanford medical school, where he also completed an internship in general surgery. He secured a research fellowship at the University of Massachusetts (UMass) and began a residency in orthopedic surgery. He resigned from this program, having been required to repeat a year, and finished his residency in orthopedics at the Phoenix Residency Program in Arizona. After a three-month fellowship in sports medicine/reconstructive surgery in Phoenix, he submitted an application for staff privileges to Sequoia, a community hospital in San Mateo.

Sequoia approved Dr. Ellison's application in June 2004 and he became a member of the provisional staff with privileges to perform orthopedic surgery, subject to an initial period of proctoring. He was proctored on seven procedures between June and September 2004 and received favorable reports on all of them. In October 2004, the surgical control committee at Sequoia notified Dr. Ellison that proctoring was no longer required for lower extremity procedures, but would continue on upper extremity procedures until further notification. It later came to light that Dr. Ellison performed several upper extremity procedures without a proctor.

In October 2005, Dr. Ellison was reappointed for a two-year period. In February 2006, the medical executive committee (MEC) appointed an ad hoc committee composed of three staff physicians to review eight of Dr. Ellison's cases: (1) a surgery to repair the patient's anterior cruciate ligament (ACL), which had taken a relatively long time (five and a half hours) to complete; (2) the cancellation of an ACL repair after the patient had been anesthetized, due to the inexperience of the particular "scrub tech"; (3) a decision to forgo leg splints as a palliative measure on a patient awaiting surgery to repair tibial fractures, who was transferred to another hospital due to insurance reasons; (4) a surgery to repair a left elbow fracture, which took approximately four hours due to Dr. Ellison's ultimately unsuccessful attempt to preserve the radial head; (5) the surgical treatment of a six year old with a broken arm, whose father was highly critical of Dr. Ellison's followup care and demeanor in the face of the boy's near hysteria when the cast was removed; (6) a surgery to release the patient's trigger finger, which required a second surgery by another physician; (7) a longer than average surgery time for a lateral meniscectomy; and (8) a complicated (and unproctored) hand surgery in which Dr. Ellison had to call a plastic surgeon for a consultation in the middle of the operation.

The ad hoc committee initially recommended that Dr. Ellison remain under proctorship for upper extremity cases and that Sequoia's orthopedics department continue to review all of his surgeries. Later, the ad hoc committee recommended that Dr. Ellison's staff privileges be revoked. The MEC decided that a revocation of privileges was too severe, but concluded that Dr. Ellison required additional training and should be accompanied by both a proctor and a board certified assistant surgeon during all surgical procedures. The MEC also found that Dr. Ellison had appeared nonresponsive and evasive during the investigation.

Dr. Ellison filed a request for a hearing before the hospital's judicial review committee (JRC) as he was entitled to do under Sequoia's written bylaws. The MEC filed a notice of charges alleging that, based on the eight cases described above, "Dr. Ellison appears to lack the requisite clinical judgment, technical capability and patient management skills to practice safely and competently as an orthopedic surgeon." The notice also alleged, "There are questions and concerns regarding the adequacy of Dr. Ellison's background and training as an orthopedic surgeon."

In describing the "questions and concerns" in the second charge, the notice referred to Dr. Ellison's lack of candor with respect to his background and training. The notice alleged: "Initially, based on the information provided in his application for Medical Staff membership and in a letter from the University of Massachusetts Medical School in 2003, it appeared that Dr. Ellison left the program voluntarily and for innocuous reasons. However on April 13, 2006, he admitted to the MEC that they 'did not like him' there and suggested that he leave." Additionally, "In the past, Dr. Ellison has been evasive about his Board certification status. In his application for Medical Staff membership dated September 23, 2003, he wrote: 'Board Eligible (Results Pending) Orthopedic Surgery.' However, on February 5, 2004, when Dr. Margolis [of Sequoia] asked him about it, he denied that he had taken the exam. When asked again in the same conversation, he said that he had taken the exam, but when asked if he had passed, he said that he was 'confused.' Finally, he admitted that he had failed." The notice did not specifically allege that this lack of candor rendered Dr. Ellison unfit to practice at Sequoia or required additional remedial measures.

An extensive hearing was held before the JRC, which was composed of four physicians from Sequoia's medical staff and presided over by an attorney who was appointed to serve as the hearing officer. Although the MEC had previously concluded that Dr. Ellison should retain his privileges subject to

the dual proctor/assistant surgeon requirement, it took the position before the JRC that all staff privileges should be revoked. Dr. Ellison took the position that the dual proctoring/assistant surgeon requirement was too restrictive.

The MEC presented the testimony of physicians who worked with Dr. Ellison at Sequoia and who had been involved in the cases at issue and/or the investigation of those cases. Broadly speaking, these doctors were critical of Dr. Ellison's performance and believed additional training and/or supervision was necessary. Dr. Sampson, an outside orthopedic surgeon who had been retained by the hospital to evaluate the eight cases under review, concluded that Dr. Ellison had shown a lack of experience but did not fall below the standard of care. Dr. Schurman, an orthopedic surgeon whom Dr. Ellison called as an expert, opined that while proctoring should continue in upper extremity cases, the requirement of a board certified assistant surgeon during all procedures was excessive. Dr. Ellison testified on his own behalf regarding his handling of the cases.

Evidence was also elicited on the subject of Dr. Ellison's honesty. Although he had been asked by UMass to repeat the second year of his residency program, he did not specifically disclose this on his application for privileges at Sequoia (though he did accurately state the dates he was in the UMass program). When MEC members had questioned him about his reason for leaving UMass, he variously said that he wanted to be closer to his girlfriend, that the UMass people had not liked him, that it had been suggested he leave, and that he "snuck" out. When the MEC asked him about the number of times he had failed the first portion of his board examination, Dr. Ellison claimed not to remember and then said he had failed it twice, even though he appeared to have failed the examination three times.[1] Dr. Ellison had claimed not to remember the date of his graduation from medical school and gave varying answers about his training, among other things, saying that he did a sports medicine fellowship that he never completed. At the time of his initial appointment to Sequoia, Dr. Ellison had represented that he was "board eligible," even though he had twice failed the first portion of his board examination.

The JRC issued a written report in which it concluded that the eight cases it had considered "demonstrate[] that Dr. Ellison was inexperienced and that the MEC's concerns about the quality of his training were not unjustified. . . . However, based on the totality of the evidence the JRC considered, . . . the eight cases did not demonstrate a pattern proving that, in fact, Dr. Ellison so

---

[1] Dr. Ellison passed the first portion of the board examination on his fourth attempt.

lacks clinical judgment, technical capability, and patient management skills, as to make the MEC's dual corrective action regime reasonable." It affirmed the MEC's decision to require the presence of a board certified assistant surgeon during Dr. Ellison's surgical procedures, but reversed the requirement that a separate proctor also be present. It recommended that the MEC formulate a protocol specifying the duration of the assistant surgeon requirement.

The JRC's report also concluded: "1. Dr. Ellison was intentionally unclear and evasive about the circumstances and reasons for his departure from the orthopedic residency program at [UMass]. [¶] 2. Dr. Ellison was not candid or honest about the number of times he had taken and failed the Board Certification examination. [¶] 3. Dr. Ellison's performance at [UMass] and, subsequently, at the Phoenix Orthopedic Residency Program, were both below average. [¶] 4. Dr. Ellison had low percentile scores on the three Board Certification exams he failed and the one he subsequently passed. [¶] . . . [¶] Much more troubling to the JRC than Dr. Ellison's post-medical training and education were Dr. Ellison's lack of candor, evasiveness, and misrepresentations (whether intentional or not). . . . Rather than providing complete and truthful responses, Dr. Ellison frequently either temporized, was evasive, professed confusion or faulty memory, was incomplete, parsed words, or was untruthful. On occasion, his testimony during the JRC hearing was marked and marred by the same deficits. [¶] There is no practical way to initiate a corrective action regime which can police or effectively assure honesty or ethical behavior. While Dr. Ellison professes to have learned much from this experience, there is no assurance that he will in the future be more candid and complete with respect to the problematic personal or clinical issues. [¶] The MEC is entitled to expect honesty and ethical behavior from its Medical Staff members. While what has occurred in the past is now in the past, the JRC recommends to the MEC that it avail itself of all appropriate remedies available to it if in the future it documents or establishes conduct by Dr. Ellison which is not in keeping with the ethical requirements of medical staff membership."

Both Dr. Ellison and the MEC appealed the JRC's decision to Sequoia's board. As permitted by the bylaws, the MEC submitted a letter from El Camino Hospital showing that it had denied Dr. Ellison's application for reappointment to its staff, based on (1) his failure to give El Camino access to peer review information from the proceedings at Sequoia; (2) a question about the accuracy of information in his initial application and reapplication for privileges concerning the severance of his relationship with UMass; and (3) concerns raised by staff during his proctoring at El Camino. The MEC argued the letter was relevant to show Dr. Ellison had not been truthful when,

during the JRC hearing, he testified that there was a pending recommendation to deny his privileges at El Camino solely because of the peer review proceedings at Sequoia.

The board concluded that the hearing officer had mistakenly ruled that the JRC could not impose a greater sanction than initially recommended by the MEC, and could not consider the MEC's revised recommendation that Dr. Ellison's privileges be revoked. Noting that Dr. Ellison's honesty and credibility had been key issues throughout the proceedings, the board remanded the matter to the JRC so that it could reconsider the revocation of his privileges on that basis. The board authorized the JRC to take additional evidence.

On remand, Dr. Ellison chose not to reopen the proceedings on issues relating to his honesty. The JRC did not change its factual findings and rejected the MEC's argument that revocation was the appropriate outcome: "The JRC has unanimously decided that revocation of Dr. Ellison's professional staff membership as a remedy purportedly commensurate with its 'findings' regarding issues of Dr. Ellison's honesty, credibility, and ethics, is not factually supportable. Accordingly the imposition of a more stringent corrective action is not warranted and, necessarily, not reasonable."

The MEC again appealed to the board, which reversed the JRC's second decision and revoked Dr. Ellison's hospital privileges. The board concluded that in light of the JRC's factual findings concerning Dr. Ellison's lack of honesty, there was no substantial evidence that Dr. Ellison met the hospital's standards of honesty and integrity. The JRC hearing officer submitted a letter in response to the board's decision, noting that the JRC had been "extraordinarily conscientious and thorough" and that it "unanimously never believed that there was any factual basis to support any decision other than the one the JRC made initially and reconfirmed on remand." He further noted, "[T]he JRC was uniformly of the view that while, as noted in its initial Decision and Report, the [JRC] was troubled by certain cited examples of Dr. Ellison's evasiveness and lack of candor, none of such deficiencies supported corrective action as draconian as termination of membership and privileges." The board did not revise its decision.

Dr. Ellison filed a petition for writ of administrative mandate challenging the board's decision. (Code Civ. Proc., § 1094.5.) The superior court denied the petition and this appeal follows.

## DISCUSSION

Dr. Ellison argues that the board's decision must be reversed because (1) the board did not correctly apply the substantial evidence standard to the

JRC's decision; (2) the board violated his right to a fair hearing and the peer review statutes by imposing a harsher corrective action than that initially recommended by the MEC and by basing its revocation of staff privileges on ethical issues distinct from the original charges regarding the quality of care; and (3) federal regulations preclude a hospital board from "unilaterally" revoking a physician's privileges. We reject these claims.

## I. Peer Review at Sequoia Hospital

■ California has enacted a comprehensive statutory scheme governing hospital peer review. (Bus. & Prof. Code, § 809 et seq.; *Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1267 [91 Cal.Rptr.3d 516, 203 P.3d 1113] (*Mileikowsky*); *Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1482–1484 [80 Cal.Rptr.3d 745] (*Smith*).) The purpose of peer review is "to protect the health and welfare of the people of California by excluding through the peer review mechanism 'those healing arts practitioners who provide substandard care or who engage in professional misconduct.' " (*Mileikowsky, supra*, 45 Cal.4th at p. 1267, quoting Bus. & Prof. Code, § 809, subd. (a)(6).)

An acute care hospital such as Sequoia must have "an organized medical staff responsible to the governing body for the adequacy and quality of the care rendered to patients." (Cal. Code Regs., tit. 22, § 70703, subd. (a).) The medical staff must adopt written bylaws establishing a process of peer review to deal with "staff applications and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects . . . ." (*Id.*, subd. (b).) A hospital's bylaws govern its peer review proceedings, subject to the requirements of the peer review statutes. (*Payne v. Anaheim Memorial Medical Center, Inc.* (2005) 130 Cal.App.4th 729, 739, fn. 5 [30 Cal.Rptr.3d 230]; *Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 97 [26 Cal.Rptr.3d 744]; *Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 617, 622 [113 Cal.Rptr.2d 309]; see Bus. & Prof. Code, § 809, subd. (a)(8) ["It is the intent of the Legislature that written provisions implementing Sections 809 to 809.8, inclusive, in the acute care hospital setting shall be included in medical staff bylaws . . . ."].)

Sequoia's written bylaws delineate a three-tier process of peer review relating to possible disciplinary action or restriction of hospital privileges. At the first level, the MEC, composed of professional staff members from various departments, is authorized to investigate a staff member when reliable information indicates that he or she "may have exhibited acts, demeanor, or conduct reasonably likely to be 1) detrimental to patient safety or to the delivery of quality patient care within the hospital; 2) unethical; 3) contrary

to the Professional Staff Bylaws and Rules; or 4) below applicable professional standards." (Sequoia Hospital Professional Staff Bylaws (Sept. 7, 2005 rev.) arts. VII, § 1(a), XIII (Bylaws).)

At the second level of review, a staff member may appeal an adverse action by the MEC to the JRC, composed of not fewer than three members of the medical staff, and is entitled to a hearing before that body. (Bylaws, art. VIII, §§ 1(a), 4(d).) In all cases except those involving an initial application for membership or clinical privileges, the MEC "shall have the burden of persuading the [JRC] by a preponderance of the evidence that the action or recommendation is reasonable and warranted. . . ." (Bylaws, art. VIII, § 2(j).) The JRC must issue a written report and decision containing "[f]indings of facts and a conclusion articulating the connection between the evidence produced at the hearing and the decision reached. . . ." (Bylaws, art. VIII, § 2(*l*)(1).)

Finally, a decision by the JRC may be appealed by the staff member or the MEC to the board on the grounds of "(a) alleged substantial failure of the [JRC] or [MEC] to comply with the procedures required by the law in the conduct of hearings so as to deny due process and a fair hearing; (b) the action taken or recommended is not reasonable and warranted under the circumstances." (Bylaws, art. VIII, § 3(a).) An appeal to the board "shall be in the nature of an appellate hearing based upon the record of the hearing before the [JRC], provided that the Board . . . may accept additional oral or written evidence subject to the same rights of cross-examination or confrontation provided at the [JRC] hearing. . . ." (Bylaws, art. VIII, § 3(d).) The board "may affirm, modify or reverse the decision of the [JRC], or, in its discretion, remand the matter for further review and recommendation." (Bylaws, art. VIII, § 3(e).)

## II. *Judicial Review of Peer Review Decision*

A hospital's final decision in a peer review proceeding may be judicially reviewed by a petition for writ of administrative mandate. (Code Civ. Proc., § 1094.5; Bus. & Prof. Code, § 809.8; *Smith, supra,* 164 Cal.App.4th at p. 1499.) As relevant here, the writ shall issue when necessary to correct a prejudicial abuse of discretion by the hospital's governing body, which is established when "the findings are not supported by substantial evidence in light of the whole record." (Code Civ. Proc., § 1094.5, subds. (c) & (d).) In an appeal from an order granting or denying the writ, the appellate court must apply the same standard of review as the trial court, giving no deference to the trial court's decision. (*Smith,* at p. 1499.)

When a court reviews a hospital's final decision in a peer review proceeding on the ground that its findings were not support by substantial evidence

within the meaning of Code of Civil Procedure section 1094.5, subdivision (d), two issues must be determined: First, did the hospital's governing body (in this case the board) apply the correct standard when it conducted its own review of the matter? (*Bode v. Los Angeles Metropolitan Medical Center* (2009) 174 Cal.App.4th 1224, 1235 [94 Cal.Rptr.3d 890] (*Bode*); *Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1138 [73 Cal.Rptr.2d 695] (*Hongsathavij*).) Second, assuming the governing body applied the correct standard, was its own decision supported by substantial evidence? (*Bode*, at p. 1235; *Hongsathavij*, at p. 1138.)

When the issue presented is whether the hospital's determination was made according to a fair procedure, the court will treat the issue as one of law, subject to independent review based on the administrative record. (*Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101 [63 Cal.Rptr.2d 743].)

> III. *Sequoia's Bylaws Gave the Board the Authority to Exercise Its Own Independent Judgment as to Penalty and It Properly Exercised That Power in This Case*

We first address Dr. Ellison's contention that the board's decision must be reversed because it substituted its own judgment for the JRC's when determining the appropriate disposition, rather than applying the more deferential substantial evidence standard required by Sequoia's written bylaws. We reject the claim because we disagree with its premise. As we explain below, Sequoia's bylaws required the board to accept the JRC's factual findings if supported by substantial evidence, but gave the board the power to exercise independent judgment as to the appropriate disposition. (Bylaws, art. VIII, § 3(a) & (d).) The board in this case properly accepted the JRC's findings as to the historical facts, but reasonably concluded that based on those facts, Dr. Ellison's privileges should be revoked.

Sequoia's bylaws provide that any party aggrieved by a JRC decision may file an appeal with the board. (Bylaws, art. VIII, § 3(a).) This is consistent with the peer review statutes, under which a hospital's medical staff and its governing body both play a role in peer review proceedings. Under Business and Professions Code section 809.05, "It is the policy of this state that peer review be performed by licentiates. This policy is subject to the following limitations: [¶] (a) The governing bodies of acute care hospitals have a legitimate function in the peer review process. In all peer review matters, the governing body shall give great weight to the actions of peer review bodies and, in no event, shall act in an arbitrary or capricious manner."

Business and Professions Code section 809.05, subdivision (a) has been interpreted to mean that a hospital governing body may exercise its own

independent judgment about evidence presented to a peer review committee composed of medical staff, provided that it gives due weight to the findings of that committee and provided that the hospital's bylaws do not require the governing body to apply a more deferential standard of review. (*Weinberg v. Cedars-Sinai Medical Center* (2004) 119 Cal.App.4th 1098, 1103, 1108, 1110–1111 [15 Cal.Rptr.3d 6] (*Weinberg*).) Our initial task is ascertaining whether Sequoia's bylaws provide for a more deferential standard of review than it would otherwise exercise under the statute.

■ Sequoia's bylaws provide that a proceeding before the board "shall be in the nature of an appellate hearing." (Bylaws, art. VIII, § 3(d).) Case law has construed this phrase to invoke a substantial evidence standard of review under which the governing body must uphold the factual findings of the peer review body if they are supported by substantial evidence. (*Bode, supra,* 174 Cal.App.4th 1224, 1235; *Smith, supra,* 164 Cal.App.4th 1478; *Huang v. Board of Directors* (1990) 220 Cal.App.3d 1286, 1293 [270 Cal.Rptr. 41].) But this does not entirely resolve the issue before us.

The bylaws also give the board the ultimate responsibility of determining whether the action taken or recommended by the JRC is "reasonable and warranted under the circumstances." (Bylaws, art. VIII, § 3(a).) This is essentially a factual determination. (*Smith, supra,* 164 Cal.App.4th at pp. 1509–1510, 1515.) By giving the board the power to make this factual determination based on evidence presented at the JRC hearing (and on any additional evidence taken by the board under art. VIII, § 3(d)), the bylaws effectively allow the board to exercise its independent judgment as to what constitutes a reasonable disposition, even though it must defer to the JRC with respect to its findings on the underlying facts.

Our conclusion that the board may independently determine the appropriate disposition of a case, based on the facts found true by the JRC and supported by substantial evidence, is consistent with other provisions of Sequoia's bylaws. For example, the board may take and consider additional evidence not presented to the JRC, a power that would be meaningless if the board could not make certain factual determinations independent of the JRC's. (Bylaws, art. VIII, § 3(d).) The board also has the power to "affirm, modify or reverse" the JRC's decision, specifically allowing it to structure a different disposition than the JRC's if the latter's is not reasonable and warranted.

Turning to the specifics of this case, we consider whether the board applied the correct standard when reviewing the JRC's decision. (*Bode, supra,* 174 Cal.App.4th at p. 1235.) The board's written decision indicates that it applied the substantial evidence standard of review to the JRC's underlying factual findings and accepted as true those facts determined by the JRC. The board

went on to state that in light of the findings relating to Dr. Ellison's honesty and integrity, there was no substantial evidence to support the JRC's determination that he should retain his hospital privileges. Although the board couched this conclusion in terms of a lack of substantial evidence, it effectively determined that the JRC's decision was not "reasonable and warranted under the circumstances"—a finding it was authorized to make under the bylaws.

■ Because the board appropriately reconsidered the JRC's decision as to penalty, we must uphold that decision so long as it was itself supported by substantial evidence. (See *Hongsathavij, supra,* 62 Cal.App.4th at pp. 1136–1137; *Bode, supra,* 174 Cal.App.4th at p. 1235; Code Civ. Proc., § 1094.5, subds. (b)–(d).) It was. The board reasonably determined that Dr. Ellison's failure to honestly and completely respond to the questions about his board certification examinations and his reasons for leaving the UMass residency was behavior that could jeopardize patient safety in the future. A physician who conceals information about himself to protect his reputation might well withhold information about a case if it reflected negatively upon his skills as a practitioner. The JRC expressly found that there were no remedial measures available to assure honest and ethical behavior. "[I]t is absolutely vital that [a] physician be absolutely truthful in his or her application. Hospitals exist to help the sick and injured; they are not detective agencies. They should have the widest possible discretion in decisions affecting physician staff privileges." (*Oskooi v. Fountain Valley Regional Hospital* (1996) 42 Cal.App.4th 233, 248–249 [49 Cal.Rptr.2d 769] (conc. opn. of Sills, P. J.), fns. omitted.)

> IV. *The Board Did Not Violate Dr. Ellison's Fair Procedure Rights or the Peer Review Statutes by Imposing a Disposition More Severe than That Initially Recommended by the MEC or by Basing Its Decision on Ethical Issues Identified During the Peer Review Process*

■ "[T]he overriding goal of the state-mandated peer review process is protection of the public and . . . while important, physicians' due process rights are subordinate to the needs of public safety." (*Medical Staff of Sharp Memorial Hospital v. Superior Court* (2004) 121 Cal.App.4th 173, 181–182 [16 Cal.Rptr.3d 769].) A physician facing peer review is not entitled to the same due process protections as a criminal defendant. (*Ibid.*) The question, rather, is whether the procedure leading to the revocation of privileges was fair. (*Kaiser Foundation Hospitals v. Superior Court, supra,* 128 Cal.App.4th at pp. 101–102.) In this context, we consider Dr. Ellison's arguments that the board violated the peer review statutes and his right to a fair hearing.

Dr. Ellison claims the peer review proceedings were unfair because the board imposed a disciplinary measure more severe than the MEC's initial decision to allow him to retain privileges, subject to the requirement that he be monitored by a proctor and assisted by a board certified surgeon. We disagree. The bylaws expressly allow the board to "affirm, modify or reverse" a peer review decision. (Bylaws, art. VIII, § 3(e).) So long as the board applies the correct standard when reviewing the JRC's decision and issues a decision that is itself supported by substantial evidence, the bylaws impose no barrier to the imposition of greater restrictions than those recommended during the earlier stages of peer review. (See *Hongsathavij, supra,* 62 Cal.App.4th at pp. 1127–1128 [hospital appeals board removed physician from hospital panel even though JRC found no sufficient basis for doing so]; *Weinberg, supra,* 119 Cal.App.4th at pp. 1105–1106 [same].)

We are not persuaded by Dr. Ellison's argument that the MEC's initial, dual proctor/assistant surgeon requirement was the most restrictive action that could be taken by the board. Though the governing statutes and bylaws require the MEC to recommend a "final proposed action" and to give notice of that action, this notice does not place a limit on what the governing body might ultimately decide. (See Bus. & Prof. Code, § 809.1, subds. (a) & (b).) As previously noted, Business and Professions Code section 809.05, subdivision (a) provides, "The governing bodies of acute care hospitals have a legitimate function in the peer review process. In all peer review matters, the governing body shall give great weight to the actions of peer review bodies and, in no event, shall act in an arbitrary or capricious manner." The board's opinion demonstrates that it carefully considered the JRC's decision and that it did not act in an arbitrary or capricious manner in reaching a different conclusion about the appropriate disposition.

Nor did the board unfairly penalize Dr. Ellison for pursuing his right of administrative appeal. The goal of protecting the public would not be served by a rule that precluded the governing body from taking necessary action simply because the appealing physician assumed that the appeal would not result in a greater penalty. The bylaws expressly authorized the board to reverse or modify the JRC's decision, providing adequate notice that an appeal of the JRC decision could result in greater sanctions.

Dr. Ellison also complains he was deprived of his right to a fair hearing because he was not given adequate notice that his privileges could be revoked based on concerns about his honesty and integrity. Although the MEC's initial investigation focused on quality of care issues, the notice of charges it filed before the JRC hearing specifically alleged that Dr. Ellison had provided incomplete and inconsistent answers to questions about his board certification and his reasons for leaving his first residency at UMass. Dr. Ellison was

questioned extensively about both of these issues at the JRC hearing and had every opportunity to explain his behavior. When the board remanded the case to the JRC following the first appeal, he was given the opportunity to present additional evidence on this subject, but he elected not to do so.

Finally, Dr. Ellison argues that the proceedings conducted in his case violated the peer review statutes and the bylaws because he did not receive two full levels of peer review. He relies on *Mileikowsky, supra,* 45 Cal.4th 1259, in which the JRC hearing officer had terminated peer review proceedings based on the physician's failure to cooperate with discovery, without securing the JRC's approval of that order. (*Id.* at pp. 1266, 1275.) The Supreme Court held that the dismissal was erroneous and could not be ratified by the governing body because the peer review body had never acted on the charges before it, thus depriving the physician of one level of peer review. (*Id.* at p. 1275.)

In this case, both the MEC and the JRC reviewed Dr. Ellison's case. Though the MEC did not issue a proposed final action with respect to the allegations relating specifically to honesty and integrity, it identified these issues in its notice of charges and took the position before the JRC that a revocation of privileges was appropriate. Dr. Ellison has not demonstrated that he was deprived of meaningful peer review.

V. *Federal Regulations Do Not Preclude the Result in This Case*

Finally, we reject Dr. Ellison's argument that federal regulations preclude a hospital board from taking "unilateral" action to revoke staff privileges. He notes that in hospitals accredited for Medicare purposes, "The governing body appoints and reappoints to the medical staff and grants initial, renewed, or revised clinical privileges, based on medical staff recommendations, in accordance with the bylaws, rules and regulations, and policies of the medical staff and of the hospital." (Joint Commission Resources, Comprehensive Accreditation Manual for Hospitals (2000) MS-5.1.)[2] These guidelines (which are not controlling) contemplate that members of a hospital's medical staff will participate in the peer review process and make *recommendations.* They do not require a hospital's governing body to follow staff recommendations in every case.

---

[2] We grant Dr. Ellison's June 10, 2009 request for judicial notice, amended June 24, 2009, to the extent it seeks judicial notice of this manual. We deny his request that we take judicial notice of additional documents as they are unnecessary to our resolution of this appeal. We deny Sequoia's requests for judicial notice filed on July 9, 2009, and October 26, 2009, as unnecessary to the resolution of this appeal.

## DISPOSITION

The judgment of the superior court denying the petition for writ of mandate is affirmed. Sequoia is awarded costs on appeal.

Jones, P. J., and Bruiniers, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 28, 2010, S183118. George, C. J., did not participate therein.