Filed 11/27/13

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL MICHALSKI,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SCRIPPS MERCY HOSPITAL et al.,<br><br>    Defendants and Respondents. | D062270<br><br><br>(Super. Ct. No. 37-2012-00093521-<br>CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel M. Pressman, Judge. Affirmed.

Rosenberg, Shpall & Associates, David Rosenberg and Norman Grissom for Plaintiff and Appellant.

Arent Fox, Lowell C. Brown, Sarah G. Benator and Jonathan E. Phillips for Defendants and Respondents.

This action arises out of the denial of medical staff membership and surgical privileges to the plaintiff Michael Michalski, M.D., at three Scripps Health hospitals after Dr. Michalski was found by the Scripps Judicial Review Committee (JRC), Scripps Health Board of Trustees (Board), and the Medical Board of California (Medical Board)

to have committed acts of sexual harassment against staff at another hospital, Sharp Grossmont (Sharp). Dr. Michalski brought a petition for writ of administrative mandate under Code of Civil Procedure section 1094.5 (all further undesignated statutory references are to the Code of Civil Procedure) seeking to overturn the denial of his medical privileges. The court denied the petition.

On appeal Dr. Michalski asserts (1) Scripps acted in bad faith in denying his applications for medical staff privileges by virtue of an improper review and summary denial; (2) the Board improperly applied an "independent judgment" standard of review to overturn the JRC's decision to reject the Medical Executive Committee's (MEC's) recommendation to deny Dr. Michalski's applications for medical staff privileges; (3) the Board failed to accord "great weight" to the JRC's findings and conclusions; and (4) the Board's decision to reverse the JRC's decision was not supported by the evidence and constituted an abuse of discretion. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Findings of Sexual Harassment*

According to the Medical Board's decision, which was issued on December 3, 2008, Dr. Michalski treated a female lab technician in a "self-centered, insensitive, and exploitative manner." Dr. Michalski made "numerous inappropriate and provocative sexual comments" to her and also touched her breast and buttocks while they were working in the cardiac catheterization lab (cath lab). On another occasion, while at a restaurant, Dr. Michalski "pushed her against the wall in a hallway outside the women's restroom." Dr. Michalski also entered the women's locker room at the hospital without

2

permission on several occasions when this employee was present, including one occasion when she was in the process of getting dressed. The Medical Board found the employee's testimony "clear and convincing," in spite of Dr. Michalski's denials.

The Medical Board found that Dr. Michalski also "made numerous inappropriate and provocative sexual comments" to a second female employee at Sharp and "initiat[ed] uninvited physical contact with her." On one occasion, Dr. Michalski "pulled up the hem of [the second employee's] scrub top, exposing her midriff," and on another occasion he "cupped her right buttock with his hand." In another incident, Dr. Michalski "pushed her head down towards his crotch, as if simulating the commencement of oral sex." Dr. Michalski entered the women's locker room when this second employee was there alone. He then "picked up her civilian jeans and said, 'These things are so tiny,' and then put them against his crotch and said, 'I think they'll fit.'" The Medical Board also found the second employee's testimony to be "clear and convincing."

A third female employee, an X-ray technician, testified that Dr. Michalski "patted her on the buttocks on two occasions in 2003."

Dr. Michalski made lewd comments and gestures to a fourth female Sharp employee, a registered nurse, including a "gesture which could only be interpreted as involving oral sex," and engaged in unwanted touching.

While at a conference dinner in Hawaii, Dr. Michalski told a Boston Scientific representative "that he wanted to have sex with her; he suggested that it would be profitable for her to do so, and warned that he would make continuing sales difficult if she refused." The sales representative was so frightened by this conduct that she asked a

3

friend's husband to walk her back to her room "because she feared returning there unaccompanied."

The Medical Board also made the following conclusion in response to Dr. Michalski's own testimony: "While it cannot be concluded that Dr. Michalski knowingly provided false testimony, it is clear, at a minimum, that in some instances he deliberately emphasized or exaggerated matters to excuse his misconduct (e.g., since he was invited into the women's locker room the first time, he concluded he was always welcome there) and that in other instances he simply blocked out some events altogether (e.g., his groping of [the lab technician] in the Cath Lab)."

Following these incidents, Dr. Michalski entered into an agreement with Sharp acknowledging that such "harassment was illegal, unprofessional, and in violation of the Medical Staff Bylaws and Policies." Dr. Michalski agreed to send written apologies to the victims, to seek psychiatric counseling, and to refrain from any further harassing conduct or retaliation.

However, at the time of this agreement Sharp did not know that Dr. Michalski was engaged in a "secret, sexual relationship" with one of Sharp's registered nurses. After that relationship ended a few months later, Dr. Michalski went to the nurse's home and found another man there, "engaging in the type of relationship with [her] that Dr. Michalski had previously enjoyed." Thereafter, Dr. Michalski left the following message on the nurse's answering machine: "You are a sick, disgusting, fucking maggot. I came over to give you a letter of apology for annoying you the past few days, and I fucking heard you. You are lower than porta-potty shit." The next day, Dr. Michalski passed by

4

the employee at the hospital and whispered "whore." "Later that day, Dr. Michalski left a voice mail message asking [her] 'to avoid . . . making any specific requests about my patients . . . .'"

Upon learning of this continuing behavior, and his attempt to interfere with patient care, Sharp placed Dr. Michalski on a brief suspension, and Sharp's MEC then recommended that his medical staff privileges be revoked. Dr. Michalski requested and received a JRC hearing at Sharp, and the Sharp JRC upheld the MEC's recommendation. In early 2006, after hearing an appeal from the JRC decision, the Sharp Board agreed with the MEC recommendation and the JRC determination, and revoked Dr. Michalski's privileges. Among other things, the Board found that Dr. Michalski's harassing conduct "had a sufficient nexus to the quality of care in the Hospital to warrant the termination of his privileges on that basis alone." In July 2007 the Medical Board opened an investigation to determine whether discipline by the Medical Board was appropriate.

B. *The Peer Review Proceedings*

1. *Dr. Michalski's application for medical staff membership and privileges at the hospitals*

In November 2007 Dr. Michalski applied for medical staff membership and privileges at each of the Scripps Hospitals. On review of Dr. Michalski's application, each of the hospitals' credentials committee (which assist the MEC's in reviewing applications) identified a number of areas in which further inquiry was necessary, including their discovery that Sharp had terminated Dr. Michalski's medical staff membership in 2005, and that the Medical Board's investigation of Dr. Michalski was

5

ongoing. Thereafter, the credentials committees initiated correspondence with Dr. Michalski seeking further information about their concerns. The credentials committees also required Dr. Michalski to sign a release of information from the various institutions where he currently or previously practiced. The credentials committees then sent questionnaires to those facilities in an attempt to obtain further information regarding Dr. Michalski's behavior and conduct. However, Dr. Michalski did not provide the credentials committees with all of the requested information in a timely manner. Moreover, the questionnaires about Dr. Michalski's conduct that were sent to the other hospitals went largely unanswered. For example, when the office of the chief of staff of Alvarado Hospital responded to the credentials committees on January 14, 2009, it sent a routine one-page form letter, sent by the medical staff coordinator, that provided only Dr. Michalski's dates of staff affiliation, staff status ("active"), specialty, and a statement that "no medical staff disciplinary actions [had] been taken or [were] pending against" Dr. Michalski. Nor did any of the other hospital facilities respond to the questionnaire.

According to Jerrold Glassman, M.D., the Scripps Mercy chief of staff at the time of Dr. Michalski's applications, the Department of Navy responded to the letter, but returned the questionnaire blank. Dr. Glassman also testified that he believed questionnaires were also sent to "Sharp, to the La Mesa Cardiology Group, [and] to Alvarado Hospital," and that he did not "recall any responses" to those questionnaires either. As with the Navy, several of the facilities provided generic responses to the letters sent by the credentials committees, but did not respond to the questionnaires.

6

Once the Medical Board issued its decision, Dr. Michalski characterized it as "favorable" in letters he sent to the credentials committees.

Dr. Michalski thereafter requested a hearing to challenge all three recommendations.

### 2. *The JRC hearing*

The parties agreed to a single hearing with a single JRC consisting of seven physician members, with at least two members from each of the hospitals' medical staffs. A hearing officer was appointed by stipulation of the parties, followed by the selection of JRC candidates, who were then appointed by further agreement of the parties. On June 1, 2010, in preparation for the JRC hearing, the MEC's issued their notice of charges consisting of the following six charges: (1) Dr. Michalski generally failed to meet his burden under Scripps La Jolla Medical Staff Bylaws (bylaws) sections 2.3-1(a), 2.3-1(c), and 4.2 as an applicant to the medical staff to resolve the MEC's reasonable doubts as to whether he is professionally and ethically competent and able to work cooperatively with others so as not to adversely affect patient care (the fitness standard); (2) Dr. Michalski has an admitted history of behavioral misconduct and sexual harassment that does not meet the fitness standard; (3) the September 14, 2005 report of the JRC of Sharp demonstrates that Dr. Michalski does not meet the fitness standard; (4) the December 3, 2008 Medical Board decision demonstrates that Dr. Michalski does not meet the fitness standard; (5) Dr. Michalski's self-serving responses to the hospitals' inquiries demonstrate that he does not meet the fitness standard; and (6) Dr. Michalski's lack of forthrightness in the Sharp JRC hearing demonstrates that he does not meet the fitness standard.

7

The JRC hearing began on August 11, 2010, and eight evidentiary sessions were held from October 2010 through April 2011. The JRC issued its decision on May 5, 2011. Despite finding that Dr. Michalski's behavior at Sharp included "egregious acts of sexual harassment" that were "aggressive, predatory, and reprehensible," the JRC rejected the MEC's recommendations to deny Dr. Michalski's application. It was not a unanimous decision. Two of the JRC members agreed with the MEC that Dr. Michalski did not meet the fitness standard and that he should not be granted medical staff privileges at the hospitals.

3. *The MEC's appeal to the Scripps Health Board of Trustees*

Following the JRC's decision, the MEC's timely appealed to the Board.

Section 7.5-6 of the bylaws establishes the Board's standard of review following a JRC decision:

"DECISION

"a. Except as provided in Section 7 .5-6(b)*,* within thirty (30) days after the conclusion of the appellate review proceedings, the Board of Trustees shall render a final decision and shall affirm the decision of the Judicial Review Committee *if, in the independent judgment of the Board of Trustees*, the Judicial Review Committee's decision is supported by the evidence, following a fair proceeding.

"b. Should the Board of Trustees determine that the Judicial Review Committee decision is not supported by the evidence, *the Board may modify or reverse the decision of the Judicial Review Committee . . . .* (Italics added.)

On December 12, 2011, the Board held a hearing on the MEC's appeal. On January 9, 2012, the Board issued its decision, reversing the JRC's decision and confirming the MEC's recommendation to deny Dr. Michalski's Application, finding that

8

"the MEC['s] recommendation to deny Dr. Michalski's application was, and remains, reasonable and warranted."  The Board's concluding paragraph states that its decision was "based upon the JRC's factual findings and the hearing record, including but not limited to the scope and severity of the prior misconduct which involved repeated abuses of Dr. Michalski's superior position, Dr. Michalski's written statements to the MEC[']s and his oral statements to this Board . . . ."

4. *Dr. Michalski's petition for writ of mandate/trial court's decision*

On March 7, 2012, Dr. Michalski filed a petition for writ of mandate in the Superior Court of San Diego County seeking to overturn the Board's Decision.  Prior to the hearing on the petition, the trial court provided the parties with a written tentative ruling indicating that the court was inclined to grant the petition.  After hearing oral argument, however, the court denied the petition.  In so doing the trial court found that "the Board properly exercised its independent judgment as it was required under the Bylaws in reviewing the JRC's decision."  The court found that "the Board gave great weight to the JRC's factual findings, accepting most of those findings, rejecting those that were not supported by substantial evidence and disagreeing with as to the conclusions to be drawn from the others . . . ."  The court further found that "the Board's decision is supported by substantial evidence, including, but not limited to, the uncontroverted evidence presented by the MEC[']s at the JRC hearing as to the meaning and application of the Fitness Standard at the Hospitals—a standard that . . . is allowed to be more stringent tha[n] those of other hospitals and of the Medical Board of California's standards for licensure."

9

Dr. Michalski's timely appeal follows.

DISCUSSION

I. *STANDARD OF REVIEW*

The Court of Appeal in *Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1136-1137 (*Hongsathavij*) set forth the applicable standard of review for this matter: "As to the function of the Court of Appeal, our function in this context is the same as the superior court's, which was the same as the hospital's governing body. 'Like the trial court, we also review the administrative record to determine whether its findings are supported by substantial evidence in light of the whole record, our object being to ascertain whether the trial court ruled correctly as a matter of law." [Citations.] The appellate court thus does not review the actions or reasoning of the superior court, but rather conducts its own review of the administrative proceedings to determine whether the superior court ruled correctly as a matter of law. [Citation.] [¶] Moreover, an appellate court must uphold administrative findings unless the findings are so lacking in evidentiary support as to render them unreasonable. [Citations.] A reviewing court will not uphold a finding based on evidence which is inherently improbable [citation], or a finding based upon evidence which is irrelevant to the issues. [Citations.] Therefore, even if a finding is supported by evidence, if that evidence is irrelevant to the charge, the decision must be reversed for insufficient evidence."

Moreover, we may only overturn the decision denying Dr. Michalski's application if (1) the Board proceeded without, or in excess of, its jurisdiction; (2) there was not a fair trial; or (3) there a prejudicial abuse of discretion by the Board. (§ 1094.5, subd. (b).)

10

Dr. Michalski does not dispute that the hospitals acted within their jurisdiction or that there was a fair trial. The only question we are thus presented with is whether there was a prejudicial abuse of discretion by the Board.

Section 1094.5, subdivision (d) defines the abuse of discretion standard of review applicable to Dr. Michalski's petition for writ of mandate: "[I]n cases arising from private hospital boards . . . abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."

Moreover, as explained by the Court of Appeal in *Weinberg* v. *Cedars-Sinai Medical Center* (2004) 119 Cal.App.4th 1098, 1106-1107 (*Weinberg*): "[I]n examining a hospital board's decision, the superior court must determine two issues. [Citations.] 'First, it must determine whether the governing body applied the correct standard in conducting its review of the matter. Second, after determining as a preliminary matter that the correct standard was used, then the superior court must determine whether there was substantial evidence to support the governing body's decision.'"

In writ proceedings, the trial court "presumes that the [administrative tribunal's] decision is supported by substantial evidence, and the petitioner bears the burden of demonstrating the contrary." *(McAllister* v. *California Coastal Com.* (2008) 169 Cal.App.4th 912, 921.) Further, because the hospital's governing body has "final responsibility for the quality of its medical staff and care, . . . its decisions within this domain are entitled to deference" by the court. (*Weinberg, supra,* 119 Cal.App.4th at p. 1109.)

11

## II. *ANALYSIS*

A. *The Board Properly Applied the "Independent Judgment" Standard Mandated by the Bylaws*

Dr. Michalski asserts the Board erroneously applied the "independent judgment" standard of review in reviewing the JRC's decision. He contends that the proper standard of review was substantial evidence because the bylaws state that the review by the Board "shall be in the nature of an appellate review." We reject this contention.

The bylaws specifically provide that the Board was required to use its independent judgment in determining whether the JRC's decision was supported by the evidence: "[T]he Board of Trustees shall render a final decision and shall affirm the decision of the Judicial Review Committee if, *in the independent judgment of the Board of Trustees*, the Judicial Review Committee's decision is supported by the evidence." (Bylaws ¶ 7.5-6, subd. (a)], italics added.) The bylaws further provide that the Board can overturn the JRC's decision if it determines that the decision is not supported by the evidence. (Bylaws ¶ 7.5-6, subd. (b).)

Every California hospital also must have an "organized medical staff *responsible to the governing body* for the adequacy and quality of the medical care rendered to patients" in the hospital." (Cal. Code Regs., tit. 22, § 70703, subd. (a), italics added.) The medical staff must establish bylaws which "provide formal procedures for the evaluation of staff applications and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects or conditions which the medical staff and governing body deem appropriate." (*Id.* at subd.

12

(b).)  California hospital licensing law requires that "[m]embership on the medical staff . . . be restricted to physicians . . . competent in their respective fields, worthy in character and in professional ethics."  (Cal. Code Regs., tit. 22, § 70701, subd. (a)(l)(E).)

Courts have recognized that "[the board's] primary duty is to its patients to insure the competence of its medical staff.  In the exercise of this duty, the hospital must be free to establish and enforce selection and review procedures, so long as they do not result in arbitrary or discriminatory practices."  (*Rhee v. El Camino Hospital Dist.* (1988) 201 Cal.App.3d 477, 501; *see also Weinberg, supra,* 119 Cal.App.4th at p. 1109 ["Ultimate responsibility for the discharging of this duty falls upon the Board, which is entitled to act in accordance with principles of sound corporate governance."].)

Additionally, it has been recognized that courts are not hospitals and that the Legislature has charged hospitals, not courts, to make medical staff appointment decisions.  (*Lewin* v. *St. Joseph Hospital* (1978) 82 Cal.App.3d 368, 384.)  Moreover, as this court stated in *Medical Staff of Sharp Memorial Hospital* v. *Superior Court* (2004) 121 Cal.App.4th 173, 181-182:  "[T]he overriding goal of the state-mandated peer review process is protection of the public and that while important, physicians' due process rights are subordinate to the needs of public safety."

Where permitted by a hospital's bylaws, its governing body may, using its independent judgment, completely overturn the decision of a medical staff-selected hearing committee.  (*Hongsathavij, supra,* 62 Cal.App.4th at p. 1135; *Weinberg, supra,* 119 Cal.App.4th at p. 1109; *Ellison v. Sequoia Health Services* (2010) 183 Cal.App.4th 1486, 1496-1497 (*Ellison*) ["Business and Professions Code section 809.05, subdivision

13

(a) has been interpreted to mean that a hospital governing body may exercise its own independent judgment about evidence presented to a peer review committee composed of medical staff, provided that it gives due weight to the findings of that committee and provided that the hospital's bylaws do not require the governing body to apply a more deferential standard of review."].)

Thus, under the plain language of the applicable bylaws, and the foregoing authority, the Board properly used its independent judgment in determining whether to reverse the JRC's decision.

In asserting that the role of hospital governing bodies are more limited than the foregoing authority has established, Dr. Michalski cites the California Supreme Court's decision in *Mileikowsky* v. *West Hills Hospital & Medical Center* (2009) 45 Ca1.4th 1259 (*Mileikowsky*). However, *Mileikowsky* is inapposite.

In *Mileikowsky,* a hearing officer terminated a peer review hearing due to the physician's disruptive behavior during the prehearing process. The hearing officer's action took place prior to any evidentiary hearing. The hearing committee never heard evidence and was not involved in the hearing officer's decision. The physician appealed to the hospital's board, which upheld the hearing officer's ruling dismissing the case. The Court of Appeal held that the hearing officer did not have legal authority to dismiss a hearing requested by a physician; only the hearing committee could do so. The Court of Appeal also ruled that the governing body could not "correct" the hearing officer's legal error merely by affirming it. Rather, in making appointment decisions, governing bodies must evaluate the recommendations of the peer review bodies and give them great

14

weight. In contrast to the present case, in *Mileikowsky*, "the board gave no weight to the actions of any peer review body" (*Mileikowsky, supra,* 45 Cal.4th at p. 1272, italics omitted) because there was no hearing committee decision at all. (*Ibid.*) The board simply ruled on the hearing officer's dismissal.

In asserting the Board should not have applied the independent judgment standard, Dr. Michalski also relies on *Bode* v. *Los Angeles Metropolitan Medical Center* (2009) 174 Cal.App.4th 1224. In doing so, Dr. Michalski focuses on the *Bode* court's statement that the phrase "in the nature of an appellate review" has been interpreted to mean that the appellate board is not a trier of fact, and thus the appeals body is limited to determining whether the JRC decision is supported by substantial evidence. However, the *Bode* court, citing the *Weinberg* case, specifically recognized that (a) it is the *hospital's bylaws* that determine whether or not the substantial evidence standard applies, and (b) that the substantial evidence standard does not apply in hospitals that have adopted the "independent judgment" standard. (*Bode, supra,* at p. 1236, fn. 6 [the "standard of review for hospital appellate boards is found in each hospital's bylaws; because the bylaws at issue [in *Weinberg*] did not contain language limiting the hospital's appellate body to the substantial evidence rule, the appellate board could exercise independent judgment when reviewing factfinding committee's decision, but still must accord those findings great weight"].) The Court of Appeal in *Bode* also noted that the appeals body in that case expressly stated that it was applying the substantial evidence standard. (*Ibid.*)

Here, by contrast the Board specifically stated that the standard of review applicable in the present case was the independent judgment standard. (Bylaws ¶ 7.5-6,

15

subd.( a)].)  The Board's interpretation of the Bylaws in this case, which specifically provide for the "independent judgment" standard of review, was thus correct.

In *Ellison,* the Court of Appeal rejected the very argument Dr. Michalski makes in this case.  There, the Court of Appeal held that the phrase "nature of an appellate review" and the independent judgment standard of review are complementary, not contradictory, provisions.  (*Ellison, supra,* 183 Cal.App.4th at p. 1497.)  There, the JRC found that the sanction proposed by the medical executive committee was not reasonable and warranted, despite agreeing that the physician behaved inappropriately by fabricating certain information.  As in the present case, the hospital's appeal board in *Ellison* agreed with most of the JRC's findings, but ultimately disagreed with the JRC as to the conclusion to be drawn from those findings.  The appeal board concluded that the appropriate penalty was termination from the medical staff.  The trial court and the Court of Appeal upheld the hospital's decision, concluding that the appeal board appropriately applied the "independent judgment" standard, regardless of the bylaws provision that the appeal shall be in the nature of an appellate hearing.  (*Ibid.*)  The *Ellison* court also held that when the bylaws provide that the appeal board has the authority to modify the JRC decision, the board can impose a sanction on the practitioner *even greater* than that originally recommended by the medical staffs executive committee or eventually proposed by the JRC.  (*Id.* at p. 1499.)  Such authority is also present in Scripps' bylaws.  (Bylaws ¶ 7.5-6, subd. (b)].)  The *Ellison* court thus rejected Dr. Michalski's argument that the phrase, in the "nature of an appellate review," limits the appeal board's independent judgment.

16

B. *The Board's Application of the Independent Judgment Standard in Finding Dr Michalski Did Not Meet the Fitness Standard*

Dr. Michalski asserts that in reaching its decision the Board did not appropriately apply the independent judgment standard of review but instead engaged in a "de novo review," which "totally disregard[ed] the JRC' s findings of fact and conclusions." This contention is unavailing.

The Board considered and gave great weight to all of the JRC's findings, even adopting many of those findings as its own. On pages 2 through 4 of its decision, the Board noted the many factual issues and JRC findings upon which the Board based its decision. For example, the Board adopted the JRC's finding that Dr. Michalski's behavior at Sharp was "aggressive, predatory, and reprehensible." The Board then determined that, although the finding itself was accurate and supported by the evidence, the JRC's conclusion about the significance of that finding was incorrect. The Board found that "[s]uch professional misconduct in the hospital environment creates a significant risk to the quality of patient care." The Board accepted the JRC's finding that there were no reports of behavioral misconduct at Alvarado Hospital since 2004, but then exercised its independent judgment in determining that "this fact does not necessarily lead to the conclusion that Dr. Michalski has learned professional boundaries." With regard to the witness testimony and other evidence that Alvarado Hospital has not disciplined Dr. Michalski or had complaints of inappropriate conduct, the Board accepted this finding and then exercised its independent judgment in recognizing that "the fact that Dr. Michalski meets Alvarado Hospital's fitness standard, or for that matter, that he meets the

17

California Medical Board's standards for licensure, does not mean that Dr. Michalski meets Scripps' standards for Medical Staff privileges."

The Board further relied on evidence showing that Michalski "has been under intense and essentially uninterrupted scrutiny since the events at Sharp." Based on this evidence, the Board noted that it was "concerned that once Dr. Michalski is no longer the subject of such focused attention, he may revert to his prior misconduct."

The Board accepted the JRC's finding that Dr. Michalski completed the UCSD PACE program regarding professional boundaries, but then exercised its independent judgment as to the significance of that fact. The Board noted that, "When asked by the Board what he had learned about himself and his professional responsibilities, from the Program, Dr. Michalski said that the Program was predominately [sic] people who had done something improper with a patient but he learned that he had not separated personal admiration from professional admiration." The Board further observed that "[i]nterestingly, Dr. Michalski told Dr. Kalish that he had learned that very same 'lesson' before he participated in the PACE Program. . . . This suggests that, in fact, Dr. Michalski learned nothing from the PACE Program at all."

The Board also considered and relied on the psychiatric reports submitted by Dr. Michalski. The Board noted that one of the psychiatrists whose reports Dr. Michalski submitted had never met with Dr. Michalski, and that Dr. Kalish, who did meet with Dr. Michalski, "assumed that Dr. Michalski is [at] low risk for repeating his misconduct because of the high price he has paid for his transgressions." The Board found that "[t]he

18

fact that Dr. Michalski has suffered consequences for his misdeeds is not enough to resolve the Board's doubts."

The fact that the Board disagreed with the decision reached by five of the JRC members, and instead agreed with the two dissenting JRC members and the three Hospital MEC's, is of no moment.  The Board properly exercised its independent judgment, as it was required to do under the bylaws and California law.

C. *The Board's Decision Is Supported by Substantial Evidence*

Dr. Michalski asserts that the Board's decision is not supported by the evidence and constitutes an abuse of discretion.  This contention is unavailing.

Having concluded the Board applied the correct standard of review, we must next determine whether there is substantial evidence to support the Board's decision. (*Weinberg, supra,* 119 Cal.App.4th at pp. 1106-1107.)  As discussed, *ante*, we give deference to the governing body's decision and will uphold it "unless the findings are so lacking in evidentiary support as to render them unreasonable."  (*Hongsathavij, supra,* 62 Cal.App.4th at p. 1137.)

We conclude the Board's decision is supported by substantial evidence and should be upheld.  The Board considered the entire JRC record, accepted written submissions from Dr. Michalski and the MEC's, heard oral argument by the attorneys for both sides, heard direct testimony from Dr. Michalski, and deliberated on and considered all of that information for over a month after the oral argument.  The Board then provided a detailed written decision on January 9, 2012, wherein it cited the most important evidence

19

supporting that decision and explained how and why it exercised its independent judgment to reach a decision that disagreed with the JRC's determination.

The Board relied on the testimony of Dr. Glassman, an interventional cardiologist and then chief of staff of Scripps Mercy Hospital. Dr. Glassman testified during the JRC hearing that he was familiar with the cath lab environment at all three of the hospitals and that Dr. Michalski's conduct caused him "great concern about patient safety" and concern for "a safe environment for [Hospital] employees." He testified in detail concerning why such conduct, and even the fear of the possibility of the repetition of such conduct, affect patient safety and a physician's qualification under the fitness standard. The Board also relied on Dr. Glassman's testimony that "the potential of great risk occurs in the cath lab when you have a cath lab team that cannot work strongly together." Dr. Glassman disagreed with Dr. Michalski's statement in his application that "none of the allegations had anything at all to do with patient care, quality of care, or patient safety."

The Board also considered and cited the testimony of Dr. Michalski's witnesses at the JRC hearing: Patricia Berry, Michael Koumjian, M.D., and Thomas R. Young, M.D. The Board noted that while these witnesses testified "that they had not seen Dr. Michalski engage in inappropriate conduct at Alvarado," they also testified "that they had never witnessed any inappropriate conduct at Sharp." Dr. Koumjian went so far as to claim that "Dr. Michalski's conduct at Sharp was nothing more than consensual flirting and the 'nurses liked it.'" Relying on this evidence, the Board concluded that the lack of any disciplinary action taken by Alvarado Hospital indicated that "Alvarado may be willing to tolerate behavior that other hospitals find unacceptable."

20

The Board also relied on evidence showing that Dr. Michalski may lack "the insight and understanding necessary for him to make an enduring change, a persistent problem noted by both the Sharp JRC in 2005 and the California Medical Board in 2008." The Board noted that the evidence at the hearing showed that Dr. Michalski has consistently attempted to "minimize his harassment, lay blame for his termination from Sharp on others and deny any connection between his acts and patient care." For example, in Dr. Michalski's November 22, 2008 letter to the hospitals during the application process, Dr. Michalski excused his presence in the women's locker room at Sharp as something that "was not universally considered outrageous at that time," and described his sexual harassment of one nurse as "inappropriate banter" and "incidental touching." In that letter Dr. Michalski also dismissed one of his victim's complaints by claiming that she was a "substandard performer."

The Board further relied on Dr. Michalski's November 12, 2007 letter, submitted as part of his application. In this letter, Dr. Michalski blames his termination from the Sharp medical staff on a vendetta from his former medical group who were "infuriated" by his success. Dr. Michalski also claimed that none of the allegations "had anything at all to do with patient care, quality care, or patient safety."

The Board's decision is also supported by Dr. Michalski's own statements to the Board during oral argument, where the Board observed that Dr. Michalski "expressed no remorse for the damage he had inflicted but instead continued to refer to how embarrassing this has been for him." That finding by the Board is supported by the transcript of that oral argument, where Dr. Michalski characterized his conduct as "a

21

source of tremendous embarrassment to me . . . ." As the Board noted, this pattern of excusing and minimizing his harassing conduct was not new. The Sharp JRC had already found that "Dr. Michalski consistently denied allegations that were unwitnessed; those that were, he tossed off as playful, or of no real significance. He appeared to have no regard or thought for anyone else's feelings. . . . He indicated very little, if any, honest remorse about his actions."

A similar conclusion was reached by the Medical Board: "While it cannot be concluded that Dr. Michalski knowingly provided false testimony, it is clear, at a minimum, that in some instances he deliberately emphasized or exaggerated matters to excuse his misconduct (e.g., since he was invited into the women's locker room the first time, he concluded he was always welcome there) and that in other instances he simply blocked out some events altogether (e.g., his groping of [the lab technician] in the Cath Lab)."

The Board further found: "In the independent and unanimous judgment of the Board, based upon the JRC's factual findings and the hearing record, including but not limited to the scope and severity of the prior misconduct which involved repeated abuses of Dr. Michalski's superior position, Dr. Michalski's written statements to the MEC[']s and his oral statements to this Board, the MEC['s] recommendation to deny Dr. Michalski's application was, and remains, reasonable and warranted."

In his reply brief, Dr. Michalski asserts there is no evidence, as required by Scripps bylaws, that there are questions concerning his "current" fitness to practice

medicine.  In doing so he points to the evidence presented at the JRC hearing, which concerned conduct that occurred nine years earlier.

However, as detailed *ante*, in reaching its decision the Board did not rely solely upon that evidence.  It also relied upon letters he sent to hospitals in 2007 and 2008 as part of the application process.  In the 2007 letter he blamed his termination from Sharp as based on a "vendetta" by his former medical group.  In the 2008 letter he attempted to minimize and excuse his conduct as nothing more than "inappropriate banter" and "incidental touching" and went so far as to dismiss one victim's complaints by referring to her as a "substandard performer."

Further, the Board relied on his statements made to the Board at the hearing itself where he expressed no remorse for the damage he had caused, instead stating that his conduct was "a source of tremendous embarrassment" to him.

Thus, we conclude substantial evidence supports the Board's decision.

### DISPOSITION

The judgment is affirmed.  Defendants to receive costs on appeal.

NARES, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.