Filed 2/19/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JASON Y. LIN,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>BOARD OF DIRECTORS OF PRIMECARE MEDICAL NETWORK, INC.,<br><br>  Defendant and Appellant. | D084821<br><br>(Super. Ct. No. CIVSB2313160) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Brian S. McCarville, Judge.  Affirmed.

Nossaman, Tom Curtis, Jennifer L. Meeker, and Michael Gawley for Defendant and Appellant.

Brunink, McElhaney & Kennedy and Leland P. McElhaney for Plaintiff and Respondent.

The Board of Directors (the Board) of PrimeCare Medical Network, Inc. (PrimeCare) appeals from a judgment granting the petition for writ of administrative mandamus (Code Civ. Proc. § 1094.5) filed by Jason Y. Lin, M.D. (Lin).  Lin's petition challenged the final decision by the Board in peer review proceedings regarding PrimeCare's summary suspension of Lin's

privileges to perform patient care services. The main issue is whether, as the trial court concluded, the Board acted in excess of its jurisdiction and committed a prejudicial abuse of discretion when it reversed the decision of PrimeCare's judicial hearing committee that Lin's summary suspension was not reasonable and warranted.

We conclude that the trial court properly granted Lin's petition, and we accordingly affirm the judgment.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2020, Lin was employed as a medical doctor by San Bernardino Medical Group, where he had worked since 1996.[1] PrimeCare is a private corporation that is licensed as a health care service plan under the Knox-Keene Health Care Service Plan Act of 1975. (Health & Saf. Code, § 1340 et seq. (the Knox-Keene Act).) PrimeCare "contracts with full-service health plans such as Blue Shield and Blue Cross to provide medical care to health plan enrollees." PrimeCare is responsible for conducting the peer review functions for San Bernardino Medical Group's licensed health care professionals.[2]

---

[1] The record reflects that at the time of the relevant events, although working for San Bernardino Medical Group, Lin's employer was, more specifically, OptumCare Medical Group.

[2] As stated in the applicable findings in this matter, "Independent Practice Associations (IPAs), including PrimeCare of San Bernardino, contract with PrimeCare to provide a network of providers to render covered services to the full-service health plan members. IPAs contract with individual healthcare providers and medical groups (such as the San Bernardino Medical Group) to provide medical services to full-service health plan enrollees . . . . [¶] The credentialing and peer review functions for the

2

1.     *Lin's Privileges Are Summarily Suspended by PrimeCare's Chief Medical Officer After a Patient Complaint*

On August 26, 2020, Lin conducted an office visit with a female patient in her mid-seventies. The patient's son was present during the visit. After the visit, both the patient and her son complained to the San Bernardino Medical Group's patient relations department about Lin's conduct. Specifically, the patient stated that while arguing with her about the need for a prescription, Lin hit her hand or her arm "really hard," and "it hurt." The son stated that Lin hit his mother's wrist for "60 seconds." Dr. Lin's notes from the office visit stated, "She showed me one of her skin creams which is clotrimazole topical cream and she wants a refill. I told her that this is an antifungal cream and right now she does not need it. She would not listen and kept arguing with me. I grabbed her left wrist and shook her hand trying to stop her arguing, but she would not stop. Finally she stopped. She accused me that I hit her, but I told her that the reason I grabbed her hand was to stop her from keeping arguing."

The next day, August 27, 2020, PrimeCare's chief medical officer, Dr. Paul Lim (CMO Lim) decided to summarily suspend Lin's privileges pending an investigation into the incident. Although a physician is ordinarily entitled, by statute, to written notice and a peer review hearing *before* the suspension of privileges (Bus. & Prof. Code,[3] §§ 809.1–809.4; see also *Asiryan v. Medical Staff of Glendale Adventist Medical Center* (2024) 100 Cal.App.5th 947, 957 [describing statutory requirements]), CMO Lim decided to summarily suspend Lin's privileges, effective immediately.

---

IPAs and medical groups is performed by PrimeCare." (Paragraph numbering omitted.)

[3]     Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

Presumably, CMO Lim relied on the statutory provision stating that "a peer review body may immediately suspend or restrict clinical privileges of a licentiate where the failure to take that action may result in an imminent danger to the health of any individual, provided that the licentiate is subsequently provided with the notice and hearing rights" that would normally apply. (§ 809.5, subd. (a).) Similarly, PrimeCare's "Policy and Procedure CR 06" (PrimeCare's P&P CR 06), states that "where there may be an imminent danger to the health of any individual, the Medical Director may immediately reduce or suspend the practitioner's privileges pending consideration and recommendation for action by the Credentialing Committee or [the Quality Improvement Committee]."[4]

On August 28, 2020, CMO Lim met with Lin to inform him of the summary suspension. During the meeting, Lin expressed frustration at the patient who had lodged the complaint, stating that he was so frustrated with her that if, he could have, he would have slapped her across the face. Lin made a slapping gesture as he made that statement.

2. *PrimeCare's Corporate Quality Improvement Committee Decides That Lin's Summary Suspension Must Stay in Place Until Lin Completes an Anger Management Course*

PrimeCare's P&P CR 06 requires "consideration and recommendation for action by the Credentialing Committee or QIC" after a summary suspension by the "Medical Director." Accordingly, on September 4, 2020, PrimeCare's Corporate Quality Improvement Committee (CQIC) met to consider whether to continue the summary suspension of Lin's privileges put

---

[4] The text of PrimeCare's P&P CR 06 explains that it exists to "define[ ] the process for the implementation of ongoing monitoring of practitioner sanctions, complaints, and quality issues between recredentialing cycles and the appropriate action taken against practitioners when occurrences of poor quality are identified."

4

in place by CMO Lim.  Lin was not given notice or an opportunity to appear at the CQIC meeting, but the CQIC considered a brief written statement from Lin, dated August 31, 2020.[5]  The CQIC decided to keep Lin's summary suspension in place pending completion of an anger management course and with the understanding that upon his return to work, Lin would be accompanied by a chaperone for a period of six months.  The letter informing Lin of the CQIC's decision stated that Lin could challenge the decision by requesting a formal hearing before a hearing panel.

3.      *PrimeCare's Judicial Hearing Committee Holds a Formal Peer Review Proceeding and Reverses the Summary Suspension*

Lin requested a formal hearing regarding his summary suspension.  As a result, on October 27, 2020, PrimeCare notified Lin that its judicial hearing committee (JHC) would hold a formal hearing.  PrimeCare also sent Lin a Notice of Charges, which stated:

"1. On August 26, 2020, you hit patient . . . on the left wrist;

"2. On August 26, 2020, you grabbed patient['s] . . . left wrist and shook her hand;

---

[5]      Lin sent the statement to his employer's "Investigation Department" on August 31, 2020.  It stated, "That day in my office I tapped her left hand to bring her [*sic*] attention and not just keep asking me to fill one of [her] old antifungal cream prescription from his [*sic*] previous retired physician for her hands, and old pain medication for pain in wrist.  I took her left wrist and shook her hand to prove that there was no pain in wrist.  I tapped my own hand and showed her not to slap or rub hard on her wrists that will cause more tissue damage and bruises on skin which she already has had for some time.  I know some of [*sic*] Chinese people like to do this because they believe that will improve blood circulation.  The son was 6 feet away from my back, he might have heard sound but he would not be able to see clearly what I was doing [in] my examination on her [*sic*] mother when she was sitting in chair and not up on the examining table.  It was just part of examination and not assault."

5

"3. On August 26, 2020, you shook patient['s] . . . wrist and/or hand in an effort to stop her from arguing with you;

"4. Your hitting and/or shaking of patient['s] . . . wrist and/or hand constitutes a violation of the Code of Conduct . . . in that it constitutes . . . 'behavior that endangers employees, members, customers or partners . . . '; and

"5. Your hitting and/or shaking patient['s] . . . wrist and/or hand constitutes a battery as defined in Penal Code Section 242."

The JHC, which was composed of medical doctors, held hearings on three days in January and February 2021. Multiple witnesses testified, including Lin. The JHC's hearing officer instructed the JHC pursuant to the applicable provisions of the Business and Professions Code (§§ 809.3, subd. (b)(3), 809.5) and the NAMM California Corporate Fair Hearing Plan (Fair Hearing Plan), which supplied the rules that PrimeCare used during Lin's peer review proceedings.[6] According to those instructions, PrimeCare had the burden to establish by a preponderance of the evidence that "at the time the action was taken: (a) PrimeCare determined that failure to immediately suspend Dr. Lin's privileges may result in an imminent danger to the health of any individual; and, (b) if so, whether that determination was reasonable and warranted under the circumstances." In their briefing to the JHC, both parties agreed with that standard.

The JHC issued a written decision in July 2022, which concluded that PrimeCare did not meet its burden to prove that Lin's immediate suspension was warranted.

---

[6] According to the JHC's decision, NAMM, which is an acronym for North American Medical Management, California, is a management services organization that provides administrative services to PrimeCare. The JHC's decision states that the Lin's peer review proceeding was "a proceeding pursuant to the NAMM California Corporate Fair Hearing Plan."

"The Judicial Hearing Committee did not believe that PrimeCare had met its burden to demonstrate that Dr. Lin was an imminent danger to any person including his patients. The case provided by PrimeCare was a single, isolated incident, never before seen in Dr. Lin's behavior. No evidence was provided to show inappropriate touching with any other patient, including other patients the same day.

"This does not mean that the Judicial Hearing Committee did not find [*sic*] Dr. Lin's behavior appropriate or acceptable. On the contrary, the Judicial Hearing Committee found the action of inappropriately touching the patient to be entirely unacceptable. Patient protection is foremost for the physicians. Requiring anger management training seems especially appropriate in this case where an otherwise apparently normal physician would snap and touch a patient inappropriately, whether that was a tap, slap, wring or other touch. Likewise requiring a chaperone for some period of time would allow Dr. Lin to continue to practice but with the safety of a chaperone monitoring his behavior through the process of anger management training and for some time thereafter.

"This is not the Judicial Hearing Committee substituting its solution as being a 'better' alternative but rather the Judicial Hearing Committee identifying the scope of what it believes was a [*sic*] reasonable and warranted under the circumstances.

"On the question of battery, the facts support a finding of battery which is touching without consent. . . . The evidence is clear that Dr. Lin's touching of the patient was without consent."

In the "Conclusion" portion of its ruling, the JHC set forth comments that substantively tracked the part we have quoted above from the body of the decision, although one of the sentences seems to be incomplete, perhaps due to a typographical error. "The Judicial Hearing Committee, after hearing the testimony and reviewing the documents as [*sic*] exhibits concludes that PrimeCare failed to meet its burden of demonstrating that Dr. Lin's behavior reached the level of threatening imminent harm to a person, including

7

patients. The evidence convinced the Judicial Hearing Committee that Dr. Lin required correction and monitoring. But the lack of any history provided through the witnesses and to [*sic*] the documentation that Dr. Lin had ever previously or subsequently inappropriately touched a patient [*sic*]. The Judicial Hearing Committee found that the evidence supported intervention to assist Dr. Lin and to protect patients." In this portion of the decision, the JHC also explained that "[t]he statement by Dr. Lin to [CMO Lim] regarding slapping the patient was viewed by the Judicial Hearing Committee as bluster and an expression of frustration, but not as an actual threat to the patient in this case or any other patient."

4. *PrimeCare's Board of Directors Reverses the Judicial Hearing Committee*

PrimeCare responded to the JHC's decision by requesting that its corporate board of directors (i.e., the Board) defer taking final action to "allow the parties to submit briefing and oral argument on whether the [JHC's] final written decision is consistent with the applicable burden of proof, and whether [the Board] should render a final decision consistent with the applicable burden of proof." PrimeCare made its request to the Board pursuant to section 2.1 of the Fair Hearing Plan. That provision does not provide for a right of appeal to the Board following a decision by the JHC, but it allows the Board to take action in certain circumstances:

> "There are [*sic*] shall be no right of appeal to the Board of Directors or its designee following a formal hearing. However, the Board of Directors or it's [*sic*] designee shall have the discretion to defer taking final action pending such further proceedings as it may direct or allow, including but not limited to: further proceedings before the Judicial Hearing Committee; further fact finding by the Board of Directors or it's [*sic*] designee; or an opportunity for oral and/or written argument by the Board of Directors or it's [*sic*] designee. The Board of Directors or it's [*sic*] designee shall endeavor to take final action as soon as

8

possible. If Boards of Directors [*sic*] are satisfied that the Judicial Hearing Committee's decision follows from a fair hearing and is consistent with the applicable burden of proof, they shall adopt that decision as the final action of the IPA. If the Board of Directors or it's [*sic*] designee conclude that the Judicial Hearing Committee's decision does not follow from a fair hearing and/or is not consistent with the applicable burden of proof, the Board of Directors or it's [*sic*] designee shall proceed as they deem necessary and appropriate to address any unfairness and render a final decision that is consistent with the applicable burden of proof."

PrimeCare argued that the JHC decision was not consistent with the applicable burden of proof "because the JHC required PrimeCare to prove facts that it did not need to prove (that Dr. Lin had a pattern of inappropriate contact with patients and that he made a genuine threat towards patients)."

In response to PrimeCare's request, the Board agreed to defer taking final action, stating that it would allow the parties to submit briefing and present oral argument. The parties submitted briefing centered on the issue of whether the JHC's decision was inconsistent with the applicable burden of proof.

PrimeCare's briefing characterized the JHC decision as "impos[ing] upon PrimeCare the burden of proving that there had been more than one incident of inappropriate touching of a patient in order to determine that Dr. Lin posed an imminent danger to patients." According to PrimeCare, "It was error for the JHC to require a showing of multiple instances of improper patient care to establish 'imminent danger.' By imposing that requirement upon PrimeCare, and by finding that PrimeCare failed to prove imminent danger because it did not show 'inappropriate touching with any other patient,' the JHC imposed an incorrect burden of proof. The JHC's Decision was therefore not 'consistent with the applicable burden of proof' and the

9

Board is obligated to 'render a final decision that is consistent with the applicable burden of proof.' "

Lin's briefing argued that the JHC *did* apply the correct burden of proof, which was stated in the hearing officer's instructions and the JHC decision itself. The fact that Lin had not engaged in a pattern of misconduct toward patients was "simply part of the evidence which led the JHC to . . . conclude," under the proper burden of proof, that Lin "did not represent an 'imminent' danger to patients when he was immediately suspended."[7]

The Board held oral argument and then issued a lengthy written decision in April 2023. The Board agreed with PrimeCare that the JHC's decision was not consistent with the applicable burden of proof, and it reversed the JHC, with the result of leaving in place Lin's suspension.

In reaching that conclusion, the Board first defined the scope of its review. Because PrimeCare was proceeding under the provision in section 2.1 of the Fair Hearing Plan that gives the Board authority to "render a final decision that is consistent with the applicable burden of proof" if it concludes that the JHC's "decision . . . is not consistent with the applicable burden of proof," the Board addressed the meaning of the phrase "not consistent with the applicable burden of proof" in section 2.1. After an extensive analysis, which relied on case law arising in the context of acute

---

[7]     Lin also raised an additional argument to the Board as to why his summary suspension was improper, which he had earlier raised before the JHC. Specifically, Lin argued that because the summary suspension was put in place by CMO Lim, and the CQIC purportedly did not independently confirm that decision, the suspension was not authorized or performed by a "peer review body" as required by section 809.5, subdivision (a). The Board ultimately rejected that argument, concluding that "there is no evidence to support Dr. Lin's contention that the process followed in this case was improper or unauthorized."

care hospital peer review, the Board adopted an approach that allowed it to independently review whether it agreed with the JHC's findings and decision:

> "The Board concludes that the language 'not consistent with the applicable burden of proof' differs from the requirement that 'substantial evidence' support the JHC Decision and the limitations asserted by Dr. Lin. Specifically, it finds that the standard does not require the same deference to the JHC Decision as the substantial evidence standard. In the Board's view, 'not consistent' is not accompanied by a qualifier such as *substantial* and denotes a required finding of incompatibility without more.'

> "Based upon all of the above, the Board concludes that in authorizing the Board to direct or allow further proceedings and its own fact finding, and to 'proceed as they deem necessary and appropriate to address any unfairness and render a final decision that is consistent with the applicable burden of proof,' Section 2.1 of the [Fair Hearing Plan] permits the Board to look at the entire record and independently determine whether the conclusions of the JHC are consistent with the applicable burden of proof."

After determining the scope of its review, the Board proceeded with its independent review by discussing the JHC's findings of fact. The Board explained that it "concur[red]" with most of the findings, including the JHC's credibility determinations, "with one exception." Specifically, the Board took issue with the JHC's finding that Lin's statement to CMO Lim "regarding slapping the patient was viewed by the [JHC] as bluster and an expression of frustration, but not as an actual threat to the patient in this case or any other patient." The Board explained, "While the JHC may have concluded in hindsight months later that Dr. Lin's comments and actions on August 28 were nothing more than benign expressions of frustration, they do not render the conclusions of [CMO Lim] and the CQIC unreasonable and unwarranted in placing and then keeping the summary suspension in place."

11

The Board then turned to the applicable legal standards. It expressly *agreed* with the legal standards set forth in the JHC decision, including the JHC's description of the preponderance of the evidence burden of proof, concluding that "the applicable standard . . . was whether, based on the information available to it at the time, PrimeCare had a legitimate belief that Dr. Lin may have represented an imminent threat to any individual were reasonable and warranted."

The Board next engaged in an extensive discussion of the facts presented to the JHC, including quoting testimony from the JHC hearing. At the outset of that discussion, it previewed the conclusion it would reach: "The Board finds that the JHC conclusion that PrimeCare had failed to establish by a preponderance of the evidence that Dr. Lin was an imminent danger because Dr. Lin's behavior with patient 'was a single, isolated incident, never before seen in Dr. Lin's behavior' and that 'No evidence was provided to show inappropriate touching with any other patient, including other patients the same day' to be inconsistent with the applicable burden of proof." The Board then separately analyzed (1) CMO Lim's August 28, 2020 summary suspension of Lin, and (2) the CQIC's September 4, 2020 decision to continue the summary suspension until Lin completed an anger management course.

As to CMO Lim's decision to suspend Lin, the Board explained, "The Board believes that all of the above evidence was sufficient to satisfy the burden required of PrimeCare to establish that the summary suspension imposed by [CMO] Lim . . . was reasonable and warranted. . . . [¶] In the Board's view, [CMO] Lim did not have the luxury of relying upon the absence of any similar behavior in Dr. Lin's past. [CMO] Lim also did not have the luxury of waiting to see what might have caused Dr. Lin to act in such an

12

egregious manner. . . . As such, [the JHC's] finding was inconsistent with the applicable burden of proof."

As to the CQIC's decision to continue the summary suspension until Lin completed an anger management course, the Board explained, "Dr. Lin's comment two days after his encounter with [the patient] that he would have slapped her in the face if he could have, standing alone, supported a conclusion that Dr. Lin *may* represent an imminent threat to patients if permitted to return to work immediately with no further intervention. In requiring that Dr. Lin undergo an anger management course, the CQIC adopted a course that was well 'within the range of reasonable and warranted alternatives available to it.' In its meeting on September 4, the CQIC had the responsibility to make patient safety its priority in determining what to do with Dr. Lin. The JHC conclusions that Dr. Lin's comments were merely 'excited utterances' or 'bluster' added a dimension that was inconsistent with the burden of proof. The same is true of the JHC conclusion that the absence of Dr. Lin's history of similar conduct made the CQIC decisions unreasonable."

The Board then stated its overall conclusion, "After review of the entire record, the Board finds that the evidence produced in the Hearing was more than sufficient to establish by a preponderance of the evidence that PrimeCare met its burden to prove that its actions in summarily suspending Dr. Lin were reasonable and warranted. As such, the JHC Decision is inconsistent with the applicable burden of proof and therefore reversed."

5.      *Lin Files a Petition for Writ of Administrative Mandamus to Challenge the Board's Decision*

On June 9, 2023, Lin filed a Petition for Writ of Administrative Mandamus (the Petition) against the Board, in which he sought an order (1) reinstating his credentials and clinical privileges, and (2) requiring

13

PrimeCare to report the reinstatement to the relevant entities.[8]  The Petition alleged that "[w]hen reviewing the decisions of its Judicial Hearing Committees, PrimeCare's Board of Directors does not have 'independent judgment' authority.  Accordingly, the Board acted without authority and exceeded its jurisdiction, and committed a prejudicial abuse of discretion, as a matter of law."  The Petition further alleged (consistent with Lin's position before the JHC and the Board) that the suspension of Lin's privileges was improper because it was not authorized or performed by a "peer review body" as statutorily required (§ 809.5, subd. (a)) due to the fact that CMO Lim carried out the summary suspension.

After considering the parties' briefing and reviewing the administrative record, the trial court granted the Petition at a November 17, 2023 hearing. Among other things, the trial court explained that the Board did not have the authority to conduct an independent review of the JHC's decision and that the Fair Hearing plan "constrains [the Board] in ways that are clearly inconsistent with 'independent judgment' authority.  The trial court concluded that the JHC decision was, in fact, consistent with the applicable burden of proof, and the Board had engaged in an "unauthorized re-weighing of the evidence."  The trial court also agreed with Lin's contention that his summary suspension was improper, for the "separate and additional reason"

---

[8]     As relevant here, section 805 requires the filing of a report with the relevant state licensing agency having regulatory jurisdiction over the licentiate within 15 days after a peer review body imposes "[r]estrictions . . . on staff privileges, membership, or employment for a cumulative total of 30 days or more for any 12-month period, for a medical disciplinary cause or reason" (§ 805, subd. (b)(3)), or "within 15 days following the imposition of summary suspension of staff privileges, membership, or employment, if the summary suspension remains in effect for a period in excess of 14 days" (*id.*, subd. (e)).

14

that it was not performed by a "peer review body" as required by statute (§ 809.5, subd. (a)) due to CMO Lim's involvement.

The trial court issued a writ of mandate requiring the Board "(a) to adopt the decision of the [JHC] as its final action on [Lin's] administrative appeal from the summary suspension of [Lin's] credentials and clinical privileges; (b) to reinstate [Lin's] credentials and clinical privileges; and (c) to report to [Lin's] prior employer (OptumCare Medical Group, Inc.), the California Medical Board, and the National Practitioner Data Bank that [Lin's] credentials and clinical privileges are reinstated and in good standing."  The Board appeals from the trial court's judgment.

## II.

## DISCUSSION

A.    *Applicable Legal Standards*

Peer review encompasses the process by which a peer review body determines whether a licensed health care professional "may practice or continue to practice in a healthcare facility, clinic, or other setting providing medical services, and, if so, to determine the parameters of that practice." (§ 805, subd. (a)(1)(A)(i)(I).)  In certain instances, the results of a peer review process must be reported to the agency that licenses the health care professional.  (*Id.*, subd. (b).)

Sections 809 to 809.8 set forth the minimum procedures that must be followed when a "licentiate"[9] is the subject of a final proposed action of a peer review body for which a report is required to be filed with the relevant licensing agency under section 805.  (See § 809.1, subd. (a).)  "The two

_____

9     As used in the relevant statutory provisions, " 'licentiate' means a physician and surgeon, podiatrist, clinical psychologist, marriage and family therapist, clinical social worker, professional clinical counselor, or dentist." (§ 809, subd. (b).)

15

primary goals of the peer review statute are 'to protect the health and welfare of the people of California by excluding through the peer review mechanism "those healing arts practitioners who provide substandard care or who engage in professional misconduct" ' and 'to protect competent practitioners from being barred from practice for arbitrary or discriminatory reasons.' " (*Natarajan v. Dignity Health* (2021) 11 Cal.5th 1095, 1103 (*Natarajan*).)

As we have explained, the required procedures set forth in the peer review statute normally include notice and a hearing (§§ 809.1–809.4), but an exception allows a peer review body to "immediately suspend or restrict clinical privileges of a licentiate where the failure to take that action may result in an imminent danger to the health of any individual, provided that the licentiate is subsequently provided with . . . notice and hearing rights." (§ 809.5, subd. (a).)

There is no statutory requirement that a peer review body provide a licentiate with an internal appeal mechanism after a peer review hearing, but it may do so, and it may authorize the appellate body to apply a de novo standard of review. Specifically, section 809.4, subdivision (b) states, "If an appellate mechanism is provided, it need not provide for de novo review, but it shall include the following mi[n]imum rights for both parties: [¶] (1) The right to appear and respond. [¶] (2) The right to be represented by an attorney or any other representative designated by the party. [¶] (3) The right to receive the written decision of the appellate body."

A licentiate may challenge a final decision in a peer review proceeding by filing a petition for writ of administrative mandamus under Code of Civil Procedure section 1094.5. (*Bichai v. DaVita, Inc.* (2021) 72 Cal.App.5th 1126, 1135; § 809.8.) In such a proceeding, the inquiry is "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair

16

trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc, § 1094.5, subd. (b).) In an appeal from a ruling on a petition for a writ of mandamus challenging a peer review decision, "[a]n appellate court reviews the final peer review decision, 'not the reasoning or actions of the superior court.' " (*Bichai,* at p. 1135.)

B.    *There Is No Merit to Lin's Contention That His Summary Suspension Was Not Performed by a Peer Review Body as Statutorily Required*

We first address Lin's contention (and the trial court's ruling) that the summary suspension initially imposed by CMO Lim was improper because it did not consist of a summary suspension by a "peer review body."

As we have explained, "a peer review body may immediately suspend or restrict clinical privileges of a licentiate where the failure to take that action may result in an imminent danger to the health of any individual, provided that the licentiate is subsequently provided with . . . notice and hearing rights." (§ 809.5, subd. (a).) Lin contends that CMO Lim was not a "peer review body" and therefore did not have the authority to implement a summary suspension of clinical privileges. According to Lin, the CQIC was the relevant "peer review body," but it was not involved in the initial suspension decision. Lin's argument lacks merit.

The term "peer review body" is defined in section 805, subdivision (a)(1)(B). That provision states, in relevant part, " 'Peer review body' includes: [¶] . . . [¶] (ii) A health care service plan licensed under Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code . . . ." (§ 805, subd (a)(1)(B); see also § 809, subd. (b) [expressly adopting definition in § 805, subd (a)(1)].) Chapter 2.2, Division 2 of the

17

Health and Safety Code is the Knox-Keene Act (Health & Saf. Code, § 1340.) Based on the undisputed factual findings in this case, "PrimeCare is a limited Knox-Keene licensed entity." Accordingly, PrimeCare is a "peer review body" and, as such, is authorized by section 809.5, subdivision (a) to summarily suspend a physician's clinical privileges in appropriate circumstances.

According to the statutory definition, a " 'peer review body . . . includes any *designee* of the peer review body." (§ 809, subd. (b), italics added.) As a corporation, PrimeCare must necessarily act through its agents. (*Presbyterian Camp & Conference Centers, Inc. v. Superior Court* (2019) 42 Cal.App.5th 148, 151.) PrimeCare's P&P CR 06 gives its presiding medical officer the authority to act on PrimeCare's behalf when summary suspension is necessary. Specifically, it states that "where there may be an imminent danger to the health of any individual, the Medical Director may immediately reduce or suspend the practitioner's privileges pending consideration and recommendation for action by the Credentialing Committee or QIC." Here, in summarily suspending Lin, CMO Lim was acting on the authority given to him by PrimeCare as a peer review body, which itself had the authority to perform a summary suspension under the conditions set forth in section 809.5, subdivision (a).[10] The CQIC's subsequent action to reaffirm the summary suspension was also exercised pursuant to that authority.

---

[10]    As we will discuss at more length below, the peer review statute provides that, with certain express exceptions, "[i]t is the policy of this state that peer review be performed by licentiates." (§ 809.05.) PrimeCare's designation of CMO Lim to perform summary suspensions was consistent with that policy, as CMO Lim is medical doctor and therefore a "licentiate." (§ 809, subd. (b).)

18

After the summary suspension imposed by CMO Lim and the CQIC, Lin was entitled, pursuant to statute, to a full hearing held under the normal peer review procedures.  (§ 809.5, subd. (a) [a peer review body may immediately suspend clinical privileges under appropriate circumstances "provided that the licentiate is subsequently provided with the notice and hearing rights set forth in Sections 809.1 to 809.4, inclusive"].)  Lin received such a hearing before the JHC.

Thus, we concur with the Board's conclusion that, with respect to the process employed by CMO Lim and the CQIC, "there is no evidence to support Dr. Lin's contention that the process followed in this case was improper or unauthorized."

C.    *The Board Exceeded Its Jurisdiction and Committed a Prejudicial Abuse of Discretion*

The next issue is whether, as Lin contends (and the trial court concluded) the Board acted in excess of its jurisdiction and committed a prejudicial abuse of discretion in reversing the JHC's decision based on its conclusion that the JHC decision was "not consistent with the applicable burden of proof," as that phrase is used in section 2.1 of the Fair Hearing Plan.

1.    *The Board's Interpretation of Section 2.1 Is Not Reasonable*

The Board relied on section 2.1 of the Fair Hearing Plan (section 2.1) for its authority to review and reverse the JHC decision.  In so doing, it interpreted section 2.1 in a very broad manner to give it the authority to conduct what was essentially an independent review of the JHC's decision. The parties dispute whether the language of section 2.1 supports that broad interpretation.

As an initial matter, the Board argues that we should defer to its interpretation of section 2.1.  The Board relies on the principle that " '[w]hile

19

final responsibility for interpreting a statute or regulation rests with the courts and a court will not accept an agency interpretation that is clearly erroneous or unreasonable, " '[a]s a general rule, the courts defer to the agency charged with enforcing a regulation when interpreting a regulation because the agency possesses expertise in the subject area.' " ' " (*American Chemistry Council v. Office of Environmental Health Hazard Assessment* (2020) 55 Cal.App.5th 1113, 1139.)  The contention lacks merit.

For one thing, PrimeCare is not a public agency; rather, it is a private corporation that has adopted certain written procedures for its peer review process.  Moreover, even if, in some contexts, it might be appropriate to defer to a private medical organization's specialized expertise, section 2.1 "involves a procedural rule and the rights that rule provides in an adversarial context. Interpreting the procedural rule does not involve an exercise of medical expertise or judgment." (*Smith v. Adventist Health System / West* (2010) 182 Cal.App.4th 729, 750, 754 [the court would not defer to the hospital's interpretation of its bylaws when the issue was the meaning of the terms "applicant" and "final adverse decision" in a provision stating "[a]n applicant who has received a final adverse decision regarding appointment shall not be eligible to reapply to the medical staff for a period of 36 months" (italics omitted)].)  Indeed, the question before us involves interpreting *legal* terms in section 2.1, such as "burden of proof" and "fair hearing."  Courts are at least as well positioned as the Board to understand such terminology.  Accordingly, we will independently review the meaning of section 2.1.  (See *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [the interpretation of written instrument when there is no extrinsic evidence is essentially a judicial function].)

Turning to the relevant part of section 2.1, it provides that "[i]f the Board of Directors or it's [*sic*] designee conclude that the Judicial Hearing Committee's decision . . . is not consistent with the applicable burden of proof, the Board of Directors or it's [*sic*] designee shall proceed as they deem necessary and appropriate to address any unfairness and render a final decision that is consistent with the applicable burden of proof." The central disputed issue is how to interpret the phrase "not consistent with the applicable burden of proof."

The term "burden of proof" has a clear legal meaning. Evidence Code section 115 states, " 'Burden of proof' means the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court. The burden of proof may require a party to raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt." (Evid. Code, § 115.)

The peer review statute plainly sets forth the applicable burden of proof. "The peer review body shall bear the burden of persuading the trier of fact by a preponderance of the evidence that the action or recommendation is reasonable and warranted." (§ 809.3, subd. (b)(3).) Section 1.17.1.2 of the Fair Hearing Plan similarly states the applicable burden of proof. "If the Board of Directors or it's [*sic*] designee's action involves the termination of an existing practitioner's contracted services or employment agreement, or the suspension, reduction or limitation of privileges to perform patient care services, the Board of Directors or it's [*sic*] designee shall have the burden of persuading the Judicial Hearing Committee by a preponderance of the evidence that its action is reasonable and warranted."

21

Accordingly, the burden of proof in this case was simply that PrimeCare had the burden to make the required legal showing by a preponderance of the evidence. The required legal showing was that PrimeCare's action in summarily suspending Lin was reasonable and warranted. In turn, a summary suspension is reasonable and warranted only if "the failure to take that action may result in an imminent danger to the health of any individual." (§ 809.5, subd. (a).) Therefore, a JHC decision that was "not consistent with the applicable burden of proof" in this case would mean a decision that did not identify and apply the legal principle that PrimeCare had the burden to prove by a preponderance of the evidence that Lin's summary suspension was reasonable and warranted because the failure to take that action may have resulted in an imminent danger to the health of any individual.[11]

---

[11] The JHC decision shows that the JHC identified and applied the correct burden of proof. The JHC decision stated, "The burden by a preponderance of the evidence lies on PrimeCare to prove that its action was reasonable and warranted." Further, the JHC accurately quoted section 809.5, subdivision (a) as setting forth the underlying legal standard that must be met for a summary suspension, namely that "failure to take that action may result in an imminent danger to the health of any individual." Applying those correctly stated standards, the JHC explained, "The Judicial Hearing Committee did not believe that PrimeCare had met its burden to demonstrate that Dr. Lin was an imminent danger to any person including his patients. The case provided by PrimeCare was a single, isolated incident, never before seen in Dr. Lin's behavior. No evidence was provided to show inappropriate touching with any other patient, including other patients the same day." Similarly, the JHC's conclusion stated, "The Judicial Hearing Committee, after hearing the testimony and reviewing the documents as exhibits concludes that PrimeCare failed to meet its burden of demonstrating that Dr. Lin's behavior reached the level of threatening imminent harm to a person, including patients." Nothing in that discussion diverges from the applicable burden of proof.

But the Board interpreted section 2.1 as giving it authority to do far more than simply determine whether the JHC identified and applied the appropriate burden of proof in reaching its decision. Instead, the Board believed its role was to examine whether, *in its own assessment*, the facts presented to the JHC were sufficient to carry PrimeCare's burden. In essence, the Board assumed for itself the role of performing a de novo review in the first instance.

In support of its broad interpretation of section 2.1, the Board placed heavy reliance on case law arising in the acute care hospital context, in which the governing bodies of hospitals are given a role in the peer review process. (E.g., *Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259 (*Mileikowsky*); *Weinberg v. Cedars-Sinai Medical Center* (2004) 119 Cal.App.4th 1098 (*Weinberg*); *Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123(*Hongsathavij*); *Huang v. Board of Directors* (1990) 220 Cal.App.3d 1286 (*Huang*).) However, as we will discuss in section II.C.2, because PrimeCare is not an acute care hospital, that case law has no application here.

Moreover, if we were to adopt the Board's broad interpretation of section 2.1 as giving it the authority to independently review the JHC's decision, the first sentence of section 2.1 would be rendered meaningless surplusage. (*Ticor Title Ins. Co. v. Rancho Santa Fe Ass'n* (1986) 177 Cal.App.3d 726, 730 [when interpreting a writing, "[i]f possible, the court should give effect to every provision," and "[a]n interpretation which renders part of the instrument to be surplusage should be avoided"].) The first sentence of section 2.1 states, "There are [*sic*] shall be no right of appeal to the Board of Directors or its designee following a formal hearing." However, if, as the Board concluded, it has the authority to conduct an independent

23

review of the JHC's decision to determine whether it would have made the same factual findings and reached the same conclusion as the JHC, any party who disagrees with the JHC's decision would have an incentive to apply to the Board to conduct an independent review under the pretense that the JHC decision was not consistent with the applicable burden of proof. In effect, the Board's interpretation would implement a *routine* practice of taking appeals to the Board to perform an independent review, in direct conflict with the first sentence of section 2.1.

In sum, we conclude that the plain language of section 2.1 does not support the Board's interpretation of section 2.1 as giving it the right to conduct an independent review of the JHC decision to assess whether it would have reached the same result under the applicable legal standards. Instead, section 2.1 conferred authority on the Board to decide only whether the JHC identified the preponderance of the evidence burden of proof and then applied that burden of proof, using the applicable legal standards.

2. *To the Extent It Permits the Board to Perform Peer Review, Section 2.1 Is Inconsistent With the Statutory Requirement That Peer Review Be Conducted by Licentiates*

Having determined that the language of section 2.1 does not support the broad role that the Board assigned to itself in the peer review process, we next consider whether there is any *statutory* basis for the broad review powers that the Board perceived in section 2.1.

PrimeCare was authorized by the peer review statute to provide an internal appellate procedure for reviewing a decision of the JHC. (§ 809.4, subd. (b) [stating that "[i]f an appellate mechanism is provided" it must provide certain "mi[n]imum rights"].) Further, PrimeCare was authorized to adopt a de novo standard of review for that appellate procedure, if it chose to do so. (*Ibid*.) Importantly, however, the peer review statute states that "[i]t

24

is the policy of this state that peer review be performed *by licentiates*" (§ 809.05, italics added), meaning licensed healthcare professionals (§ 809, subd. (b)).  Our Supreme Court has explained that peer review *by licentiates* is important for insuring a fair proceeding.  Making the observation in the context of a case involving a hospital's medical staff, our Supreme Court explained, "[s]ince a hospital's medical staff is made up of doctors and other licentiates who could one day *themselves* be subject to a peer review hearing, each medical staff has an incentive to ensure fairness in the process for conducting peer review . . . ." (*Natarajan, supra*, 11 Cal.5th at p. 1114, italics added.)

The statute does contain one express exception to the policy that licentiates should perform peer review.  However, that exception applies only to acute care hospitals.  (§ 809.05, subds. (a)–(c).)  "Hospitals have a dual structure.  The administrative governing body, which might not include health care professionals, takes ultimate responsibility for the quality and performance of the hospital.  The hospital's medical staff evaluates staff applications and credentials, appointments, reappointments, and assignments of clinical privileges." (*Mileikowsky, supra*, 45 Cal.4th at p. 1272.)  Thus, the peer review statute provides that, even though they are not necessarily composed of licentiates, "[t]he governing bodies of acute care hospitals have a legitimate function in the peer review process.  In all peer review matters, the governing body shall give great weight to the actions of peer review bodies and, in no event, shall act in an arbitrary or capricious manner." (§ 809.05, subd. (a).)  The statute states that, in the context of acute care hospitals, when a "peer review body's failure to investigate, or initiate disciplinary action, is contrary to the weight of the evidence, the governing body shall have the authority to direct the peer review body to

25

initiate an investigation or a disciplinary action, but only after consultation with the peer review body." (*Id.*, subd. (b).) Further, in the context of acute care hospitals, "[i]n the event the peer review body fails to take action in response to a direction from the governing body, the governing body shall have the authority to take action against a licentiate" by following the applicable statutory procedures. (*Id.*, subd. (c).)

Due to the statutory provision allowing the governing body of an acute care hospital to participate in the peer review process, case law has explained that a hospital's bylaws may properly give the hospital's governing body the role of "final decision maker in the peer review process." (*Weinberg, supra*, 119 Cal.App.4th at p. 1108.) Specifically, based on the statutory statement that "[t]he governing bodies of acute care hospitals have a legitimate function in the peer review process" (§ 809.05, subd. (a)), "the Legislature authorized governing bodies to act in *all* peer review proceedings." (*Weinberg,* at p. 1114.) Numerous published opinions describe acute care hospital bylaws that assign an appellate role, during the peer review process, to the hospital's governing body. (See, e.g., *Mileikowsky, supra*, 45 Cal.4th at p. 1266; *Ellison v. Sequoia Health Services* (2010) 183 Cal.App.4th 1486, 1495; *Weinberg,* at p. 1105; *Hongsathavij, supra*, 62 Cal.App.4th at pp. 1134–1135; *Huang, supra*, 220 Cal.App.3d at p. 1292.)

PrimeCare is not an acute care hospital. The Board is therefore not a governing body of an acute care hospital covered by the statutory provisions allowing such a body to perform peer review. (§ 809.05, subds. (a)–(c).) Instead, it is a board of directors of a private corporation that is licensed as a health care service plan under the Knox-Keene Act (Health & Saf. Code, § 1340 et seq.).

26

From our initial review of the record, it was not clear whether the Board members who decided Lin's case were licentiates.  We therefore asked the parties to provide supplemental briefing on that factual issue and to address whether, if the Board members were not licentiates, the participation of the Board in peer review, as specified in section 2.1, was inconsistent with the policy "that peer review be performed by licentiates."  (§ 809.05.)

In response, the Board has confirmed that the Board members who decided Lin's case were not licentiates.  However, the Board contends that section 2.1 is nevertheless consistent with the requirements of California's peer review statute.  The Board's central response consists of an attempt to minimize the statutory statement that "[i]t is the policy of this state that peer review be performed by licentiates."  (§ 809.05.)

The Board first argues that in setting forth the policy that peer review should be performed by licentiates, the Legislature intended a distinction between "perform[ing]" peer review and "rendering a final 'decision' in a quasi-judicial peer review hearing."  Thus, according to the Board, at *any* stage of a peer review proceeding, whether at an initial peer review hearing or during the type of appeal proceeding at issue here, nonlicentiates are permitted to render a final decision.  The role of licentiates under the statutory scheme, according to the Board, is limited to "evaluating care provided by other licentiates and 'mak[ing] recommendations' for improvement or restriction of practice."[12]  The Board argues that "[s]ince the

---

[12]     For this argument, the Board quotes from the definition of " '[p]eer review' " in section 805, subdivision (1)(A).  However, the Board provides only a very limited part of that definition.  In whole, the definition is very expansive and includes a catchall provision at the end:
     " 'Peer review' means both of the following:

Legislature intended non-licentiates to render final decisions in peer review hearings, Section 809.05 does not prohibit PrimeCare's Board from doing so here."

We find no support for the Board's contention in the applicable statutory language. As we have explained, sections 809 to 809.8 set forth the statutory rules governing peer review under the specific circumstance where a final proposed action against a licentiate will be required to be reported to the relevant licensing agency under section 805. That set of statutory provisions governs the *entire scope* of the peer review process in such cases—encompassing the required notice to the licentiate (§ 809.1), the conduct of the peer review hearing (§§ 809.2, 809.3), the issuance of a written decision (§ 809.4, subd. (a)(1)), and the availability of an appeal at the option of the peer review body (§ 809.4, subd. (b).) Appearing along with these statutory provisions is the statement that "[i]t is the policy of this state that peer review be performed by licentiates." (§ 809.05.) The statute makes no

---

"(i) A process in which a peer review body reviews the basic qualifications, staff privileges, employment, medical outcomes, or professional conduct of licentiates to make recommendations for quality improvement and education, if necessary, in order to do either or both of the following:
"(I) Determine whether a licentiate may practice or continue to practice in a health care facility, clinic, or other setting providing medical services, and, if so, to determine the parameters of that practice.
"(II) Assess and improve the quality of care rendered in a health care facility, clinic, or other setting providing medical services.
"(ii) Any other activities of a peer review body . . . ." (§ 805, subd. (1)(A).)
Because the Board has omitted much of the relevant definition of " '[p]eer review,' " its statutory argument is based on an erroneous premise.

28

exception to this policy for "rendering a final 'decision,'" as the Board contends.

The Board points to section 809.2, subdivision (a), for its contention that a final decision in a peer review proceeding need not be issued by licentiates. Specifically, that provision states that a peer review hearing "shall be held, as determined by the peer review body, before a trier of fact, which shall be an arbitrator or arbitrators selected by a process mutually acceptable to the licentiate and the peer review body, or before a panel of unbiased individuals . . . and which shall include, where feasible, an individual practicing the same specialty as the licentiate." (§ 809.2, subd. (a).) The Board argues that because the trier of fact in a peer review hearing may be an arbitrator, "the Legislature authorized a non-licentiate arbitrator to render the final decision in a peer review hearing." According to the Board, "[i]t is not reasonable to conclude that the Legislature intended non-licentiates to make decisions at hearings but barred them from doing so on appeal."

We are not persuaded. For one thing, it *is* possible for an arbitrator to be a licentiate, and nothing in the statute expressly states that an arbitrator is excepted from the policy that peer review be performed by licentiates. However, we need not, and do not, decide whether it would be consistent with the policy "that peer review be performed by licentiates" (§ 809.05) for the parties in a peer review proceeding to agree, based on "a process mutually acceptable to the licentiate and the peer review body" (*id.*, § 809.2, subd. (a)), to use a nonlicentiate arbitrator as a trier of fact. Whether or not, consistent with the policy set forth in the peer review statute, the parties may agree to use a nonlicentiate arbitrator, that is not what occurred here. The Board members were not acting as arbitrators as described in section 809.2,

29

subdivision (a), and they were not selected by a process mutually acceptable to the parties.[13]

Turning next to case law, the Board contends that "[c]ourts do not interpret the policy as granting licentiates . . . exclusive rights in the peer review process." This argument fails because *all* of the case law that the Board cites for this argument arises in the context of acute care hospitals, where the peer review statute *does* allow nonlicentiates on a hospital governing body to perform peer review. (See, e.g., *El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 992–993; *Weinberg, supra*, 119 Cal.App.4th at p. 1108.) We are not aware of any case law stating that, in other contexts, it is acceptable for nonlicentiates to perform peer review.

The Board also relies on the legislative history of section 809.05 to support its attempt to minimize the statement in section 809.05 that "[i]t is the policy of this state that peer review be performed by licentiates" (§ 809.05).[14] As the Board points out, section 809.05 was added to the proposed peer review legislation after the drafters received public comment requesting that governing bodies of acute care hospitals be given a role in the

_____

[13]    We note that, pursuant to statute, a hearing officer may be appointed to assist a panel of licentiates in a peer review proceeding. (§ 809.2, subd (b).) As our Supreme Court has acknowledged, a hearing officer is often an attorney, and therefore not a licentiate. (*Natarajan, supra*, 11 Cal.5th at p. 1103.) However, the statute expressly provides that a hearing officer's role is merely to play a *facilitative* role, in that "the hearing officer . . . shall not act as a prosecuting officer or advocate, and shall not be entitled to vote." (§ 809.2, subd (b).) The express statutory prohibition on any participation by a hearing officer in the final vote in a peer review hearing serves to underscore the policy that *licentiates* perform peer review.

[14]    The Board has requested that we take judicial notice of legislative history materials from 1989. We grant the request.

peer review process. Such a provision was necessary if hospital governing boards were to have a role in peer review, as only a hospital's *medical staff* falls under the definition of a "peer review body." (See §§ 805, subd (a)(1)(B) [defining "peer review body" to include a facility's "medical or professional staff" only], 809, subd. (b).) Based on this legislative history, the Board argues that "[s]ection 809.05's policy" that peer review be performed by licentiates "is an interpretive aide courts use to address the ambiguity unique to hospital governance" and should not be read as "restricting the rights of other peer review bodies or their boards." The Board contends that "in context, the policy declaration in Section 809.05 does not limit the role of health care service plan boards. Section 809.05 was not intended to grant hospital boards authority that health care service plan boards lack, or to provide licentiates special rights over the board of health care service plans. To the contrary, Section 809.05 was an equalizer, giving hospital boards the same 'legitimate function' in peer review that peer review bodies already had."

The Board's resort to the legislative history does not advance its argument. Although section 809.05 was added to address issues unique to the structure of acute care hospitals, that fact does not distract from the guiding principle set forth in its first sentence, from which acute care hospital governing bodies are excepted: "It is the policy of this state that peer review be performed by licentiates." (§ 809.05) The Legislature created an exception to that policy only for acute care hospital governing bodies; it did not create an exception for the board of directors of a private corporation, such as PrimeCare, licensed as a health care service plan under the Knox-Keene Act (Health & Saf. Code, § 1340 et seq.).

31

Finally, the Board makes a policy argument to support its contention that a corporate board of directors of a health care services plan should be permitted to perform a peer review function, even if the board members are not licentiates. Specifically, the Board argues that it must be involved in the peer review process because there should be "some mechanism to verify that the trier of fact applies the correct burden of proof, and to take appropriate action when it does not." The Board contends that its participation is important because it has the "ultimate obligation to ensure quality care," and it should not be "expose[d] . . . to malpractice liability" and have its " 'assets . . . on the line' " with no "oversight of the peer review process." We understand the argument, but we suspect that the Board's concerns can be addressed in a manner consistent with licentiate performance of peer review, such as assigning the appellate function to a panel of licentiates overseen by the Board. Ultimately, however, because the Board's broad interpretation of its authority under section 2.1 was plainly in conflict with the statutory policy that peer review be performed by licentiates, it is not necessary for us to specify the type of internal appellate procedures that might comply with that policy while still addressing the concerns identified by the Board.

Moreover, if for some reason the Board concludes that it is unworkable for the final level of peer review to be performed by licentiates, it is ultimately a policy question for the Legislature, not for this court, whether the corporate boards of health care services plans licensed under the Knox-Keene Act (Health & Saf. Code, § 1340 et seq.) should perform peer review, even if their members are not licentiates. As currently written, however, the peer review statute precludes the type of participation in the peer review process that the Board undertook in this case.

In sum, the Board's interpretation of section 2.1 to justify its independent review of the JHC's decision was inconsistent with both (1) the plain text of section 2.1, and (2) the statutory policy that peer review be performed by licentiates. The trial court therefore properly granted Lin's petition for writ of administrative mandamus on the ground that the Board exceeded its jurisdiction and committed a prejudicial abuse of discretion when it reversed the decision of the JHC.

## DISPOSITION

The judgment is affirmed. Lin is awarded his costs on appeal.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

KELETY, J.